IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN DOE I et al.,

               Plaintiffs,

    v.

THOMAS W. WOLF, et al.,

               Defendants.

CIVIL ACTION
NO. 16-6039

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 2

    A.  Section 302 Authorizes Temporary Emergency Commitment and Treatment............. 3

    B.  Pennsylvania Uniform Firearms Act ("PUFA") ........................................................... 5

    C.  Mental Health Procedures Act ("MHPA") Reporting Requirements
        to Pennsylvania State Police ........................................................................................ 6

    D.  State Statutory Remedies ............................................................................................. 8

    E.  Plaintiffs' Section 302 Commitments ........................................................................11

        i.     John Doe I ...........................................................................................................11

        ii.    John Doe II.......................................................................................................... 12

III.  STANDARD OF REVIEW ................................................................................ 12

    A.  Subject Matter Jurisdiction ........................................................................................ 12

    B.  Failure to State a Claim for Which Relief Can Be Granted........................................ 13

IV.  ANALYSIS .......................................................................................................... 15

    A.  Sovereign Immunity Under the Eleventh Amendment .............................................. 15

        i.     Claims Against the Pennsylvania State Police.................................................. 17

ii.    Claims Against Governor Wolf, Attorney General Shapiro, and
Colonel Blocker ................................................................................. 18

B.  Procedural Due Process Under the Fourteenth Amendment....................................... 21

i.    Protected Interest ............................................................................... 22

ii.    Mental Illness Exception to the Second Amendment ....................................... 23

iii.    Plaintiffs Have Plausibly Alleged that a Person Committed Under
Section 302 May Not Fall within the Mental Illness Exception....................... 24

iv.    Adequacy of Post-Deprivation State Remedies................................................. 27

V.  CONCLUSION................................................................................................. 33

## OPINION

**Slomsky, J.**                                                                    **August 23, 2017**

## I.      INTRODUCTION

This case pits the longstanding prohibition on the possession of firearms by the mentally

ill against an individual's limited right to keep and carry firearms under the Second Amendment

to the United States Constitution.  In this action seeking a declaratory judgment and injunctive

relief, Plaintiffs bring a facial challenge to the constitutionality of Section 6105 of the

Pennsylvania Uniform Firearms Act ("PUFA"), which prohibits a person temporarily committed

under Section 302 of the Mental Health Procedures Act ("MHPA") from possessing firearms.

On November 17, 2016, Plaintiffs filed suit against Defendants Governor Thomas W.

Wolf, Attorney General Josh Shapiro, Colonel Tyree V. Blocker, and the Pennsylvania State

Police ("PSP").[1]  (Doc. No. 1.)  On January 30, 2017, Defendants filed a Motion to Dismiss

pursuant to Federal Rules of Civil Procedure Rule 12(b)(1) (lack of subject-matter jurisdiction)

and 12(b)(6) (failure to state a claim upon which relief can be granted).  (Doc. No. 13.)  On

February 13, 2017, Plaintiffs filed a Response in Opposition (Doc. No. 14), to which Defendants

filed a Reply (Doc. No. 15).  Plaintiffs filed a Sur-Reply in opposition to the Motion (Doc. No.

18), and oral argument was held on May 17, 2017 (Doc. No. 30).  The Motion to Dismiss is now

---

[1]   The Complaint initially named Bruce R. Beemer as a defendant in his official capacity as
Attorney General.   (Doc. No. 1 at ¶ 18.)  On January 17, 2017, Josh Shapiro replaced Bruce
R. Beemer as the Pennsylvania Attorney General.   Pursuant to Federal Rule of Civil
Procedure 25(d), when a public officer is a party to a suit in their official capacity and the
officer ceases to hold office while the action is pending, the officer's successor is substituted
as a party.  Fed. R. Civ. P. 25(d).  Therefore, Josh Shapiro, in his official capacity as Attorney
General, is substituted as a defendant in this matter.

ripe for a decision.[2]  For the following reasons, the Motion will be granted in part and denied in part.

## II.     BACKGROUND

Plaintiffs bring a facial challenge to the constitutionality of the Pennsylvania Uniform Firearms Act ("PUFA"), 18 Pa. Cons. Stat. Ann. § 6105 ("Section 6105"), alleging that it deprives them of their Second Amendment right without due process of law.  (Doc. No. 1 at 2.) The alleged deprivation involves the intersection of PUFA and the Mental Health Procedures Act ("MHPA"), 50 Pa. Stat. §§ 7101-7503.  The challenged statutory scheme provides for the involuntary commitment for emergency treatment of an individual for up to 120 hours if a physician determines that the individual is a danger to himself or others, and is in need of immediate mental health treatment.  50 Pa. Stat. § 7302 ("Section 302").  See also  50 Pa. Stat. § 7301.  Plaintiffs were determined to be committable under Section 302 by a physician.  (Doc. No. 1 at ¶ 2.)  In particular, Plaintiffs are challenging Defendants' Section 6105 deprivation of their fundamental right to keep and bear arms as a result of their Section 302 commitments.[3] (Doc. No. 16 at 3.)  The Court will address the relevant statutory scheme, and then discuss Plaintiffs' respective Section 302 commitments.

---

[2]   In reaching a decision, the Court has considered the Complaint (Doc. No. 1), Defendants' Motion to Dismiss the Complaint (Doc. No. 13), Plaintiffs' Response in Opposition (Doc. No. 14), Defendants' Reply (Doc. No. 15), Plaintiffs' Sur-Reply (Doc. No. 18), and the statements of counsel at the hearing held on May 17, 2017.

[3]   Plaintiffs do not challenge the validity of their Section 302 commitments, or the constitutionality of Section 302.  (Doc. No. 16 at 3.)  Rather, Plaintiffs challenge the inclusion of Section 302 commitments in the reporting requirements of Section 6105 of PUFA.  They seek to have Section 6105 "declared null and void and unenforceable to the extent it applies to someone who has only been committed under Section 302."  (Doc. No. 30 at 30:13-20.)

## A.    Section 302 Authorizes Temporary Emergency Commitment and Treatment

In Pennsylvania, an individual may be subjected to a temporary emergency commitment for up to 120 hours under Section 302 of MHPA, if "the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment." 50 Pa. Stat. § 7302 (referencing 50 Pa. Stat. § 7301 ("Section 301")). Section 301(a)—defining persons subject to involuntary emergency examination and treatment—provides as follows:

> Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 Pa. Stat. § 7301(a). Section 301(b) sets forth the standard for determining if a person presents a "clear and present danger" to himself or others.[4]

---

[4]   Section 301(b)(1) provides in relevant part as follows:

> Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. . . . For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

Under Section 301(b)(2), clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i)    the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii)   the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of

A temporary emergency commitment under Section 302 is initiated in one of two ways. First, a "physician or responsible party"[5] may make a written application to the county administrator "setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment." 50 Pa. Stat. § 7302(a)(1). This application is submitted in support of a request for a warrant requiring a person authorized by the administrator "to take such person to the facility specified in the warrant." Id. Second, "a physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination" upon "personal observation of the conduct constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment." 50 Pa. Stat. § 7302(a)(2). Under Section 302(a)(2), if the individual is taken to an approved facility for treatment without a warrant, the person transporting the individual must "make a written statement setting forth the grounds for believing the person to be in need of such examination" upon arrival. Id.

Section 302 requires that a physician must examine a person taken to a facility within two hours of arrival in order to determine if the person poses a clear and present danger of harm to himself or others and is in need of immediate treatment. 50 Pa. Stat. § 7302(b). The physician is required to make a record of the examination and his or her findings. Id. "If it is determined that

this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

<hr>

[5] The term "responsible party" is not defined in the MHPA. (Doc. No. 1 at ¶ 54.)

the person is severely mentally disabled and in need of emergency treatment, treatment shall [begin] immediately." Id. However, if the physician determines there is no need for a temporary emergency commitment or "if at any time it appears there is no longer a need for immediate treatment," the person must be discharged. Id.

The person temporarily committed under Section 302 has certain notification rights, which are as follows:

> Upon arrival at the facility, the person shall be informed of the reasons for emergency examination and of his right to communicate immediately with others. He shall be given reasonable use of the telephone. He shall be requested to furnish the names of parties whom he may want notified of his custody and kept informed of his status. The county administrator or the director of the facility shall:
>
> (1) give notice to such parties of the whereabouts and status of the person, how and when he may be contacted and visited, and how they may obtain information concerning him while he is in inpatient treatment; and
>
> (2) take reasonable steps to assure that while the person is detained, the health and safety needs of any of his dependents are met, and that his personal property and the premises he occupies are secure.

50 Pa. Stat. § 7302(c)(1)-(2).

### B.       Pennsylvania Uniform Firearms Act ("PUFA")

The PUFA regulates firearm possession in Pennsylvania. Relevant here is Section 6105, which identifies persons who are prohibited from possessing firearms. 18 Pa. Cons. Stat. Ann. § 6105. Section 6105(a)(1) provides in relevant part:

> A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth. . . .

18 Pa. Cons. Stat. Ann. § 6105(a)(1). Additionally, under subsection (c), the following persons "shall be subject to the prohibition of subsection (a)":

A person who has been adjudicated as an incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under section 302, 303 or 304 of the provisions of the act of July 9, 1976 (P.L. 817, No. 143), known as the Mental Health Procedures Act. This paragraph shall not apply to any proceeding under section 302 of the Mental Health Procedures Act unless the examining physician has issued a certification that inpatient care was necessary or that the person was committable.

Id. § 6105(c)(4). Therefore, a person temporarily committed and certified under Section 302 of MHPA, discussed above, is prohibited from possessing firearms in Pennsylvania. Id.

And most notably, a person subject to the prohibition of Section 6105(a) has a "reasonable period of time, not to exceed 60 days from the date of the imposition of the disability under this subsection, in which to sell or transfer that person's firearms to another eligible person who is not a member of the prohibited person's household." Id. § 6105(a)(2)(i).

### C. Mental Health Procedures Act ("MHPA") Reporting Requirements to Pennsylvania State Police

The MHPA requires that the Pennsylvania State Police be notified of any person who has been temporarily committed under Section 302. Section 109 provides as follows:

Notwithstanding any statute to the contrary, judges of the courts of common pleas, mental health review officers and county mental health and mental retardation administrators shall notify the Pennsylvania State Police on a form developed by the Pennsylvania State Police of the identity of any individual who has been adjudicated incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under this act or who has been involuntarily treated as described under 18 Pa. Con. Stat. Ann. § 6105(c)(4) (relating to persons not to possess, use, manufacture, control, sell or transfer firearms). The notification shall be transmitted by the judge, mental health review officer or county mental health and mental retardation administrator within seven days of the adjudication, commitment or treatment. Notwithstanding any statute to the contrary, county mental health and mental retardation administrators shall notify the Pennsylvania State Police on a form developed by the Pennsylvania State Police of the identity of any individual who before the effective date of this act had been adjudicated incompetent or had been involuntarily committed to a mental institution for inpatient care treatment under this act or had been involuntarily treated as described in 18 Pa. Con. Stat. Ann. § 6105(c)(4).

50 Pa. Stat. § 7109(d) (emphasis added). In sum, when an individual is temporarily committed under Section 302, the physician is required to report the identity of the individual to PSP within seven days of the commitment described in Section 302. Id.

PSP is "responsible for supplying information to the [Pennsylvania Instant Check System ("PICS")] and/or [National Instant Criminal Background Check System ("NICS")] databases that are used to disqualify persons from possessing firearms. . . ." (Doc. No 1 at ¶ 72.) While the reporting practices of PSP are not clear from the record in this case to date, once an individual is temporarily committed under Section 302 and the physician reports the individual to PSP, information about the reported individual is placed in the PICS and NICS databases according to Plaintiffs. (Id. at ¶ 4.) Once in the PICS and NICS databases, the individual is prohibited from possessing, using, controlling, selling, or transferring firearms in Pennsylvania and nationwide. 18 Pa. Cons. Stat. Ann. § 6105; 18 U.S.C. § 922(g)(4).[6]

Plaintiffs allege that as soon as an individual is prohibited from possessing firearms under the statutory scheme, that person is deprived of his or her Second Amendment right without due process of law. (Doc. No. 1 at ¶¶ 70-75, 77.) Specifically, the "prohibition applies automatically to a [t]emporary [e]mergency [c]ommitment under Section 302 once an examining physician has certified that 'inpatient care was necessary, or that the person was committable.'" (Id. at ¶ 3 (citing 18 Pa. Cons. Stat. Ann. § 6105(a)(1), (c)(4)).) Therefore, Plaintiffs claim that pre-

---

[6]  Section 922(g)(4) provides as follows:

>   It shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(4).

deprivation procedures are necessary before the PSP enters an individual who has been committed under Section 302 into the PICS and NICS systems.[7]

### D.  State Statutory Remedies

An individual has three post-deprivation procedures available to attempt to lift the firearm restrictions that result from a Section 302 commitment.  First, under 18 Pa. Cons. Stat. Ann. § 6105(f)(1), an individual can file a petition in the Court of Common Pleas seeking restoration of his or her right to possess a firearm.  Section 6105(f)(1) provides as follows:

> Upon application to the court of common pleas under this subsection by an applicant subject to the prohibitions under subsection (c)(4), the court may grant such relief as it deems appropriate if the court determines that the applicant may possess a firearm without risk to the applicant or any other person.

18 Pa. Cons. Stat. Ann. § 6105(f)(1).

Second, Section 6111.1(g)(2) provides another avenue for relief to lift the firearm restrictions.  It states in relevant part:

> A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based.  If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged.  A petition filed under this subsection shall toll the 60-day period set forth under section 6105(a)(2).

18 Pa. Cons. Stat. Ann. § 6111.1(g)(2) (footnote citing to Section 302 omitted).[8]  The Supreme Court of Pennsylvania recently addressed the standard of review under Section 6111.1(g)(2) and held that:

---

[7]  It is evident that the timing of each stage in the statutory scheme, as noted above, is critical to the due process analysis.  Therefore, understanding the timing of the commitment under Section 302, the physician's Section 109 reporting requirements to PSP, the obligation of PSP to enter the individual's name into PICS pursuant to Section 6105 and report to the federal government through NICS is essential in the instant case.

the plain language of section 6111.1(g)(2) directs a trial court to review the physician's findings, made at the time of the commitment, to determine whether the evidence known by the physician at the time, as contained in the contemporaneously-created record, supports the conclusion that the individual required commitment under one (or more) of the specific, statutorily-defined circumstances.

\* \* \*

[U]nder section 6111.1(g)(2), a challenge to the sufficiency of the evidence to support a 302 commitment presents a pure question of law, and the court's sole concern is whether, based on the findings recorded by the physician and the information he or she relied upon in arriving at those findings, the precise, legislatively-defined prerequisites for a 302 commitment have been satisfied and are supported by a preponderance of the evidence. We emphasize that the trial court's review is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings, and requires deference to the physician, as the original factfinder, as the physician examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary.

In re Vencil, 152 A.3d 235, 242, 246 (Pa. 2017). Therefore, a state court's review of a petition under Section 6111.1(g)(2) is limited and deference must be given to the physician as the original

---

8 The remainder of Section 6111.1(g) addresses when PSP must expunge an individual's mental health records. It provides:

(1) Upon receipt of a copy of the order of a court of competent jurisdiction which vacates a final order or an involuntary certification issued by a mental health review officer, the Pennsylvania State Police shall expunge all records of the involuntary treatment received under subsection (f).

\* \* \*

(3) The Pennsylvania State Police shall expunge all records of an involuntary commitment of an individual who is discharged from a mental health facility based upon the initial review by the physician occurring within two hours of arrival under section 302(b) of the Mental Health Procedures Act and the physician's determination that no severe mental disability existed pursuant to section 302(b) of the Mental Health Procedures Act. The physician shall provide signed confirmation of the determination of the lack of severe mental disability following the initial examination under section 302(b) of the Mental Health Procedures Act to the Pennsylvania State Police.

18 Pa. Cons. Stat. Ann. § 6111.1(g)(1), (3).

factfinder.  Id.  at 246.  There is no mention of a petitioner's ability to present evidence, call witnesses, or cross-examine witnesses.

Third, an individual may submit a challenge to PSP to contest the accuracy of their mental health record under 18 Pa. Cons. Stat. Ann. § 6111.1(e).  Section 6111.1(e) states:

(1) Any person who is denied the right to receive, sell, transfer, possess, carry, manufacture or purchase a firearm as a result of the procedures established by this section may challenge the accuracy of that person's criminal history, juvenile delinquency history or mental health record pursuant to a denial by the instantaneous records check by submitting a challenge to the Pennsylvania State Police within 30 days from the date of the denial.

(2) The Pennsylvania State Police shall conduct a review of the accuracy of the information forming the basis for the denial and shall have the burden of proving the accuracy of the record. Within 20 days after receiving a challenge, the Pennsylvania State Police shall notify the challenger of the basis for the denial, including, but not limited to, the jurisdiction and docket number of any relevant court decision and provide the challenger an opportunity to provide additional information for the purposes of the review. The Pennsylvania State Police shall communicate its final decision to the challenger within 60 days of the receipt of the challenge. The decision of the Pennsylvania State Police shall include all information which formed a basis for the decision.

(3) If the challenge is ruled invalid, the person shall have the right to appeal the decision to the Attorney General within 30 days of the decision. The Attorney General shall conduct a hearing de novo in accordance with the Administrative Agency Law. The burden of proof shall be upon the Commonwealth.

(4) The decision of the Attorney General may be appealed to the Commonwealth Court by an aggrieved party.

18 Pa. Cons. Stat. Ann. § 6111.1(e).  Unlike Section 6111.1(g), Section 6111.1(e)(3) provides for a de novo hearing before the Attorney General following the denial by the PSP of a challenge to the accuracy of a person's mental health record.  Id.  See also In re Vencil, 152 A.3d at 244.

Here, Plaintiffs have not attempted any of the three post-deprivation remedies to restore their firearm rights in Pennsylvania.  (Doc. No. 13 at 21-22; Doc. No. 30 at 21:15-20.)

### E. Plaintiffs' Section 302 Commitments

#### i. John Doe I

When Plaintiff Doe I was sixteen years old, he was bullied at school and became "melancholy." (Doc. No. 1 at ¶¶ 21-22.) Additionally, Plaintiff Doe I had recently ended a romantic relationship, and his mother feared he might harm himself. (Id. at ¶ 23.) On September 13, 2011, Plaintiff Doe I's mother brought him to the emergency room at Somerset Hospital. (Id. ¶ 22.) On that date, he remained in the Somerset Hospital emergency room from 11 a.m. to 6 p.m. (Id. at ¶ 22.)

Dr. George Groftisza, a physician at Somerset Hospital, evaluated Plaintiff Doe I for a possible involuntary temporary emergency commitment pursuant to Section 302. (Id. at ¶ 24.) Dr. Groftisza determined that Plaintiff Doe I was committable for emergency inpatient treatment under Section 302, and Plaintiff Doe I's mother signed paperwork that acknowledged this recommendation to commit. (Id. at ¶¶ 25-26.) Plaintiff Doe I and his mother left the emergency room that evening and he "was never treated or held involuntarily." (Id. at ¶ 26.) Plaintiff Doe I "was not provided any notice of the consequences of Section 302" before the temporary emergency commitment process began. (Id. at ¶ 27.)

Pursuant to the statutory scheme, PSP entered Plaintiff Doe I's name into the PICS database and/or reported him to the NICS database as a person who is prohibited from possessing a firearm as determined by Pennsylvania law. (Id. at ¶ 33.) In the fall of 2015, Plaintiff Doe I attempted to purchase a firearm, but was prevented from doing so when his PICS/NICS background check uncovered that he had been determined committable under Section 302. (Id. at ¶ 36.) He intended to "obtain and use a firearm for self-defense at his home." (Id. at ¶ 37.)

Six years later, Plaintiff is currently employed and has not been subsequently committed. (Id. at ¶¶ 34-35.) At this stage of the litigation, there is no information in the record regarding the details of Plaintiff Doe I's subsequent mental health history. (Doc. No. 30 at 25:10-20.)

## ii. John Doe II

On August 17, 2011, Plaintiff Doe II was taken by a friend to the emergency room of Grandview Hospital in Sellerville, Pennsylvania. (Doc. No. 1 at ¶ 38.) When he arrived at the hospital, Plaintiff Doe II was "intoxicated, and became loud and uncooperative with hospital staff." (Id. at ¶ 39.) He was put in a locked room in the hospital from 3 a.m. until approximately 12 p.m. (Id. at ¶ 40.) Plaintiff Doe II's medical records indicate that he was subjected to involuntary emergency commitment under Section 302. (Id. at ¶ 42.) He was aware that the treating physician at Grandview Hospital had confined him to a locked room; however, he did not know that he had been certified committable under Section 302. (Id. at ¶¶ 41, 43.)

In 2013, Plaintiff Doe II attempted to purchase a firearm "for self-defense at his home" and was prohibited from possessing a firearm because of his Section 302 commitment. (Id. at ¶¶ 41, 52.) Plaintiff alleges that PSP entered his Section 302 commitment into the PICS database and reported the information to the NICS database. (Id. at ¶ 49.)

After his emergency room stay on August 17, 2011, Plaintiff Doe II participated in an alcohol rehabilitation program, and "has been sober and gainfully employed ever since." (Id. at ¶ 51.) Similar to Plaintiff Doe I, there is no information in the record concerning the details of Plaintiff Doe II's subsequent mental health history. (Doc. No. 30 at 25:10-20.)

## III. STANDARD OF REVIEW

### A. Subject Matter Jurisdiction

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, dismissal of an action is warranted when a court lacks subject matter jurisdiction over the case. Fed. R. Civ. P.

12(b)(1). When reviewing a motion to dismiss under Rule 12(b)(1), a court must determine whether the motion is a facial or factual challenge. See In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012) (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)). "A facial attack challenges only the court's subject matter jurisdiction. A factual attack allows the court to question the plaintiff's facts after the defendant files an answer." Machon v. Pa. Dep't of Pub. Welfare, 847 F. Supp. 2d 734, 743 (E.D. Pa. 2012) (citing Mortensen, 549 F.2d at 891). Here, no answer has been filed by Defendants. Therefore, the Rule 12(b)(1) Motion is necessarily a facial attack on the Court's subject matter jurisdiction.

Facial attacks contest the sufficiency of the pleadings, and a court "must accept the complaint's allegations as true." Turicentro, S.A. v. Am. Airlines Inc., 303 F.3d 293, 300 n.4 (2002) (overruled on other grounds by Animal Sci. Prods., Inc. v. China Minmetals Corp., 654 F.3d 462 (3d Cir. 2011)). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." In re Schering Plough Corp., 678 F.3d at 243 (citing Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (internal quotations omitted)). When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of persuasion. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991) (citing Mortensen, 549 F.2d at 891).

B.      **Failure to State a Claim for Which Relief Can Be Granted**

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663; see also Bell Atl. Corp. v. Twombly, 550

U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at

14

679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV. ANALYSIS

Defendants' Motion to Dismiss will be granted in part and denied in part. Pursuant to Federal Rule of Civil Procedure 12(b)(1), which covers subject matter jurisdiction and concomitantly the sovereign immunity doctrine of the Eleventh Amendment, Governor Wolf, Attorney General Shapiro, and the Pennsylvania State Police ("PSP") will be dismissed as defendants. However, Defendant Colonel Blocker is being sued in his official capacity as Commissioner of PSP for prospective injunctive relief, and will remain as a defendant in this case. In addition, because the Complaint has plausibly alleged a claim entitled to relief when viewing the allegations within it in light most favorable to Plaintiffs, Defendants' 12(b)(6) Motion to Dismiss for Failure to State a Claim will be denied.

### A. Sovereign Immunity Under the Eleventh Amendment

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Eleventh Amendment sovereign immunity prevents citizens from bringing a suit in federal court against his or her own state, unless the state consents to be sued and waives its immunity. Pennhurst State Sch. v. Halderman, 465 U.S. 89, 100 (1984). "The eleventh amendment's bar extends to suits against departments or agencies of the state having no existence apart from the state." Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981).

Despite the sovereign's privilege under the Eleventh Amendment, there are several ways a state or state official can be sued in federal court, two of which are relevant here. First, a state may consent to be sued in federal court. Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73

(2000). However, a state's consent must be unequivocally expressed. <u>Pennhurst State. Sch.</u>, 465

U.S. at 99. By statue, Pennsylvania has expressly withheld consent:

> Federal courts. Nothing contained in this subchapter shall be construed to waive
> the immunity of the Commonwealth from suit in Federal courts guaranteed by the
> Eleventh Amendment to the Constitution of the United States.

42 Pa. C.S. § 8521(b). <u>See also</u> <u>Laskaris</u>, 661 F.2d at 25.

Second, in <u>Ex parte Young</u>, the Supreme Court established an important limit on the

sovereign immunity principle which allows a suit to proceed against a state official in his or her

official capacity only when the relief sought is prospective injunctive relief. 209 U.S. 123

(1908); <u>Virginia Office for Protection and Advocacy v. Stewart</u>, 563 U.S. 247, 254 (2011). <u>Ex</u>

<u>parte Young</u> involved:

> a challenge to a Minnesota law reducing the freight rates that railroads could
> charge. A railroad shareholder claimed that the new rates were un-constitutionally
> confiscatory, and obtained a federal injunction against Edward Young, the
> Attorney General of Minnesota, forbidding him in his official capacity to enforce
> the state law. When Young violated the injunction by initiating an enforcement
> action in state court, the Circuit Court held him in contempt and committed him to
> federal custody. In his habeas corpus application in this Court, Young challenged
> his confinement by arguing that Minnesota's sovereign immunity deprived the
> federal court of jurisdiction to enjoin him from performing his official duties.
>
> [The Supreme Court] disagreed. [The Court] explained that because an
> unconstitutional legislative enactment is "void," a state official who enforces that
> law "comes into conflict with the superior authority of the Constitution," and
> therefore is "stripped of his official or representative character and is subjected in
> his person to the consequences of his individual conduct. The State has no power
> to impart to him any immunity from responsibility to the supreme authority of the
> United States."

<u>Virginia Office for Protection and Advocacy</u>, 563 U.S. at 254 (internal citations omitted).

The <u>Ex parte Young</u> doctrine established that "sovereign immunity does not apply

because an official who acts unconstitutionally is 'stripped of his official or representative

character.' This rationale, of course, created the 'well-recognized irony' that an official's

unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment." Pennhurst State Sch., 465 U.S. at 104-05 (quoting Ex parte Young, 209 U.S. at 160 and Florida Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 685 (1982)).

The Eleventh Amendment, however, still bars some forms of relief against state officials for violation of federal law when prospective injunctive relief is not the remedy sought. The Ex parte Young doctrine does not apply when "the state is the real, substantial party in interest, as when the judgment sought would expend itself of the public treasury or domain, or interfere with public administration." Virginia Office for Protection and Advocacy, 563 U.S. at 255 (internal citations and quotations omitted). Moreover, "when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." Pennhurst State Sch., 465 U.S. at 102-03 (discussing the holding in Edelman v. Jordan, 415 U.S. 651 (1974)). Thus, while prospective injunctive relief is permissible, retroactive monetary relief is barred by the Eleventh Amendment.

### i. Claims Against the Pennsylvania State Police

The Pennsylvania State Police is a state agency and is entitled to invoke sovereign immunity under the Eleventh Amendment as a bar to suit in federal court. PSP is an agency within the Commonwealth's executive branch of government. 71 Pa. Stat. § 61. See also Dyche v. Bonney, No. 04-1833, 2005 WL 3118034, at *3 (M.D. Pa. Nov. 22, 2005) ("The PSP is an arm of the state for Eleventh Amendment purposes."). Therefore, as a state agency, PSP is protected from suit under the Eleventh Amendment to the United States Constitution. Laskaris, 344 F.2d at 25. Further, PSP has not consented to being sued. As a result, PSP is an improper defendant and all claims against PSP will be dismissed.

### ii. Claims Against Governor Wolf, Attorney General Shapiro, and Colonel Blocker

Plaintiffs filed this action against Governor Wolf, Attorney General Shapiro, and Colonel Blocker in their official capacities in relation to their respective roles of enforcing the laws of the Commonwealth of Pennsylvania, including the Pennsylvania Uniform Firearms Act ("PUFA"). (Doc. No. 1 at ¶¶ 17-19.) Plaintiffs seek declaratory and injunctive relief against these Defendants for the alleged violation of the Fourteenth Amendment Due Process Clause. (Doc. No. 1 at 18-19.) As such, Defendants fall within the <u>Ex parte Young</u> exception to the Eleventh Amendment jurisdictional bar which allows them to be sued when a plaintiff seeks prospective injunctive relief.

However, there still must be a sufficient connection between the state official and the offending conduct in question. Defendants argue that Governor Wolf and Attorney General Shapiro cannot be held accountable for the equitable relief that Plaintiffs seek "because they have no authority over or responsibility for administering the [PUFA]."[9] (Doc. No. 13 at 11.) Defendants argue that Plaintiffs must allege a "close official connection" between the state

---

[9] Defendants do not address sovereign immunity as applied to Defendant Colonel Blocker. (<u>See</u> Doc. No. 13 at 9-13.) Defendant Colonel Blocker, in his official capacity, is the Commissioner of the Pennsylvania State Police. (Doc. No. 1 at ¶ 19.) He exercises command responsibility over the PSP and is responsible for assisting the Governor in enforcing the laws of the Commonwealth of Pennsylvania, including the PUFA. (<u>Id.</u>) Specifically, the challenged statutory scheme mandates that PSP be notified "of the identity of any individual who has been adjudicated incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under" Section 302 within seven days of the commitment or treatment. 50 Pa. Stat. § 7109(d); 18 Pa. C.S.A. § 6105(c)(4). Consequently, there is a clear connection between Defendant Colonel Blocker's duty to assist the Governor in enforcing the laws of the state, and the Plaintiffs' interests. <u>See</u> <u>1st Westco Corp. v. Sch. Dist. of Phila.</u>, 6 F.3d 108, 113 (3d Cir. 1993); <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1208 (3d Cir. 1988). Moreover, Defendants concede that Defendant Colonel Blocker is an appropriate defendant "because it's his agency that has enforcement authority, under the [PUFA]. . . ." (Doc. No. 30 at 15:11-14.) Thus, the <u>Ex parte Young</u> doctrine applies, and Plaintiffs' claims against Defendant Colonel Blocker are not barred by the Eleventh Amendment.

official and enforcement of the law.  (Id. (citing Ex parte Young, 209 U.S. at 156).)  Defendants

rely on two Third Circuit opinions to support their position: Rode v. Dellarciprete, 845 F.2d 1195

(3d Cir. 1988) and 1st Westco Corp. v. Sch. Dist. of Phila., 6 F.3d 108 (3d Cir. 1993)

("Westco").

In Rode, a civilian employee of the Pennsylvania State Police brought a civil rights action

against PSP, and various state officials, including the Governor and Attorney General of the

Commonwealth of Pennsylvania, to contest PSP regulations.  845 F.2d at 1197.  The plaintiff

argued that "both the Governor and Attorney General had the requisite connection with

enforcement here where they both had the power to review and approve PSP regulations, and

where the Governor had the ultimate responsibility for the enforcement of those regulations."  Id.

at 1208.  The Third Circuit affirmed the district court's decision granting motions to dismiss the

action against the Governor and Attorney General.  Id. at 1197.

The Third Circuit found:

> The Governor and Attorney General both have similar powers to review and
> approve for form and legality all proposed rules and regulations of executive
> agencies.  The power to review and approve a departmental regulation for form
> and legality, however, does by no means charge the Governor and Attorney
> General with the duty to enforce that regulation.  Rode also contends that the
> Governor is an appropriate defendant because he has "ultimate responsibility for
> the enforcement of the regulations of the PSP," citing to Allied Artists Pictures
> Corp. v. Rhodes, 473 F. Supp. 560, 568 (S.D. Ohio 1979) (Allied I).  The court in
> Allied I held that Young permitted a plaintiff to bring an action challenging a state
> law naming as a defendant a Governor with the general duty to enforce the laws.
> The court limited this holding to those cases in which there was a "real, not
> ephemeral, likelihood or realistic potential that the connection will be employed
> against the plaintiff's interests."  Here, there is no realistic potential that the
> Governor's general power to enforce the laws of the state would have been
> applied to a departmental regulation against a PSP administrative assistant.

Id. at 1208 (internal citations omitted).

In <u>Rode</u>, the plaintiff brought a constitutional challenge to a departmental regulation. There, it was clear that the Governor and Attorney General's power to "enforce the laws of the state" did not involve a realistic potential that the connection would be exercised against plaintiff's interest. <u>Id.</u> Here, Plaintiffs are bringing a facial challenge to a state statute that is incorporated into a firearm and mental health statutory scheme. While Plaintiffs' challenge a state law of general applicability, unlike an agency-specific law, there is no realistic potential that the Governor and Attorney General's power to enforce the laws of the state would be applied when an individual is committed under Section 302.

In fact, the close official connection in Plaintiffs' facial challenge lies with PSP Commissioner, Defendant Colonel Blocker. In <u>Rode</u>, the Third Circuit distinguishes <u>Allied Artists Pictures Corp. v. Rhodes</u>, 496 F. Supp. 408 (S.D. Ohio 1980) ("<u>Allied</u>"), a case which held that <u>Ex parte Young</u> "permitted a plaintiff to bring an action challenging a state law naming as a defendant a Governor with the general duty to enforce the laws." <u>Rode</u>, 845 F.2d at 1208. The Third Circuit specifically noted that the plaintiff in <u>Allied</u> would have been barred from challenging the statute by the Eleventh Amendment "unless it could name the Governor as a defendant." <u>Id.</u> at 1209. Just as in <u>Rode</u>, here "there is no reason to strain the [<u>Ex parte Young</u>] doctrine to reach [the Governor and the Attorney General]" because Plaintiffs can challenge the constitutionality of the statue by naming PSP Commissioner, Defendant Colonel Blocker. <u>Id.</u>

The second case that Defendants rely on similarly support dismissing the Governor and the Attorney General pursuant to sovereign immunity. In <u>Westco</u>, a contractor sued a school district and challenged the constitutionality of a Pennsylvania statute that allowed a school district to refuse payment to a contractor who failed to meet certain residency requirements. 6 F.3d at 111. The Third Circuit used <u>Rode</u> to find that the Governor and Attorney General were

not proper parties to the suit. Id. at 116. In Westco, the statute at issue specifically placed the enforcement of the statute in the hands of the school district rather than the Commonwealth Officials. Id. at 114-15.

Here, the statutory scheme at issue only directs the PSP, and by extension, Defendant Colonel Blocker in his official capacity, to enforce the statute. See 50 Pa. Stat. § 7109(d); 18 Pa. Cons. Stat. Ann. § 6105(c)(4), (j). It does not extend to the Governor or Attorney General. Thus, analogous to the instant case:

> If we were to allow Westco to join the Commonwealth Officials in this lawsuit based on their general obligation to enforce the laws of the Commonwealth, we would quickly approach the nadir of the slippery slope; each state's high policy officials would be subject to defend every suit challenging the constitutionality of any state statute, no matter how attenuated his or her connection to it. Such a result is undesirable, a drain on resources of time and money, and contrary to Rode.

Id.

Therefore, Governor Wolf and Attorney General Shapiro are improper defendants and all claims against them will be dismissed. However, Colonel Blocker is a proper defendant under Ex parte Young and will remain as a defendant in the case.

### B.  Procedural Due Process Under the Fourteenth Amendment

In the Complaint, Plaintiffs allege that the PUFA deprives them, and others similarly situated, of their Second Amendment right without adequate due process based on their Section 302 commitments. (Doc. No. 1 at ¶ 83.) The Due Process Clause of the Fourteenth Amendment forbids a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. There are two elements to a procedural due process violation. First, there must be a protected liberty or property interest at stake. Robb v. City of Phila., 733 F.2d 286, 292 (3d Cir. 1984). Second, if protected interests are implicated, then the

court must address what procedures constitute due process of law.  Id.; Rogin v. Bensalem Tp., 616 F.2d 680, 694 (3d Cir. 1980).

### i. Protected Interest

Defendants contend that the Complaint does not identify a protected liberty or property interest that someone found to be mentally ill has in possessing a firearm, and therefore cannot assert a procedural due process challenge to the PUFA.  (Doc. No. 13 at 22-27.)  Plaintiffs submit to the contrary that the Second Amendment is a fundamental right and is clearly a protected interest, even though the United States Supreme Court has not identified the fundamental right under the Second Amendment as a property or liberty interest.  (Doc. No. 14 at 10-11.)

In District of Columbia v. Heller, the Supreme Court discussed in-depth an individual's Second Amendment right to possess firearms.  554 U.S. 570 (2008).  In Heller, the Supreme Court found that there was "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."  Id. at 595.  Although the Court held that the Second Amendment right was an enumerated fundamental right, it also held that this right was "not unlimited."  Id. at 626.  While the Supreme Court held that the District of Columbia's ban on handgun possession in the home was unconstitutional, the holding was narrow and addressed only the "core" right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  Id. at 634-35.  Further, Heller did not define the right conferred by the Second Amendment as either a "property" interest or a "liberty" interest.

In McDonald v. City of Chicago, Ill., the Second Amendment right to bear arms was incorporated to the states.  561 U.S. 742, 791 (2010).  The Court held that the Second Amendment right to bear arms was a right that was "fundamental" to "our system of ordered liberty."  Id. at 778.  The Supreme Court again held that the Second Amendment right was not absolute, id. at 802, but did not define the right in terms of a liberty or property interest.

Even though the Second Amendment right has not been defined in terms of a liberty or property interest, the Supreme Court has found that the two rights are equally protected under the law and some kind of hearing is required before a person may be deprived of that interest.  As the Supreme Court said in Wolff v. McDonnell, the "analysis as to liberty parallels the accepted due process analysis as to property.  The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests."   418 U.S. 539, 557-58 (1974) (citing Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)).   In this regard, after Heller, the First Circuit has held that "[a]lthough the right established in Heller is a qualified right . . . the right to possess arms (among those not properly disqualified) is no longer something that can be withdrawn by [the] government on a permanent and irrevocable basis without due process." United States v. Rehlander, 666 F.3d 45, 48 (1st Cir. 2012).  Therefore, Plaintiffs have plausibly alleged that there is a protected interest at stake, satisfying the first level of procedural due process analysis under the Fourteenth Amendment.[10]

### ii.  Mental Illness Exception to the Second Amendment

In Heller, the Supreme Court recognized an exception to an individual's fundamental right to bear arms for "the mentally ill."  Heller, 554 U.S. at 626-27.  The Court stated that nothing in Heller "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ."  Id.  Based on this language, Defendants argue in

---

[10]  Defendants also argue that the fundamental right created by the Second Amendment must be pursued under substantive due process instead of procedural due process.  (Doc. No. 13 at 22 n.13.)  Defendants do not cite case law that would directly support this proposition, and the argument is contradicted by case law from other circuits.  See Rehlander, 666 F.3d at 48-49 (finding that the Government cannot deprive a person of the right to possess firearms without due process); Bolton v. Bryant, 71 F. Supp. 3d 802, 809-10 (N.D. Ill. 2014) (holding that a plaintiff who was denied a concealed carry license sufficiently stated a procedural due process claim based on his Second Amendment right).

the alternative that individuals committed under Section 302 do not have a protected fundamental interest because "the right to possess a firearm notwithstanding a mental health commitment is not one guaranteed by the Second Amendment." (Doc. No. 13 at 23-24, 31-32.) In response, Plaintiffs submit that this argument "presumes that Plaintiffs' Section 302 commitments were adequate to determine they were sufficiently mentally ill to divest Plaintiffs of a fundamental right and satisfied the requirements of due process," which they vehemently contest. (Doc. No. 14 at 12 (footnote omitted).) Thus, the crux of this dispute at the Motion to Dismiss stage requires the Court to determine whether Plaintiffs have plausibly alleged that due process requires some pre-deprivation procedures after a Section 302 commitment in order to determine whether an individual falls within the mental illness exception noted in <u>Heller</u> before that person is divested of his or her Second Amendment right to bear arms.

### iii. Plaintiffs Have Plausibly Alleged that a Person Committed Under Section 302 May Not Fall within the Mental Illness Exception

Although the state has a public health and safety interest in prohibiting the possession of firearms by the mentally ill, <u>see</u> <u>Heller</u>, 554 U.S. at 626-27, there is an absence of controlling precedent for determining the due process required to establish when an individual qualifies as mentally ill within the <u>Heller</u> mental illness exception. <u>Heller</u> and its progeny did not decide or allude to the proper procedures for determining when an individual falls within the mental illness exception. <u>Id.</u> at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").

A temporary emergency commitment to a mental institution may not be enough to consider an individual mentally ill such that they are subject to prohibitions on their right to possess firearms. <u>See</u> <u>Tyler v. Hillsdale Cnty Sheriff's Dept.</u>, 837 F.3d 678, 699 (6th Cir. 2016) ("There is no indication of the *continued* risk presented by people who were involuntarily

committed many years ago and who have no history of intervening mental illness, criminal activity, or substance abuse."); Rehlander, 666 F.3d at 50 (holding that a temporary emergency commitment to a mental institution is not enough to consider someone mentally ill and disqualify them from owning a firearm under federal law).

In Tyler, the plaintiff was deprived of his Second Amendment right when he was barred from purchasing a weapon under the federal statue, 18 U.S.C. § 922(g)(4)[11], after he was involuntarily committed to a mental institution under a Michigan statute. 837 F.3d at 680, 699. The Sixth Circuit cautioned against categorically relying on the language in Heller, which indicated that the longstanding prohibitions on the possession of firearms by the mentally ill were "presumptively lawful." Id. at 686-88.

> To rely solely on Heller's presumption here would amount to a judicial endorsement of Congress's power to declare, "Once mentally ill, always so." This we will not do. Heller's presumption of lawfulness should not be used to enshrine a permanent stigma on anyone who has ever been committed to a mental institution for whatever reason.

Id. at 688. The Sixth Circuit found that "people who have been involuntarily committed are not categorically unprotected by the Second Amendment." Id. at 690.

Citing Rehlander and Tyler, the United States District Court for the Middle District of Pennsylvania held that a plaintiff was unconstitutionally deprived of Second Amendment right after an involuntary commitment. Keyes v. Lynch, 195 F. Supp. 3d 702, 722 (M.D. Pa. 2016). In Keyes, the plaintiffs brought a constitutional challenge to the federal statue, 18 U.S.C. § 922(g)(4)[12], alleging that as-applied to the plaintiffs, the federal law violated the Second Amendment and the Due Process Clause of the Fifth Amendment. Id. at 705. One plaintiff was

---

[11] See, supra, n.6.

[12] See, supra, n.6.

a state trooper who was able to carry a gun in his official capacity, but was barred from carrying a gun outside of work due to being placed on NICS, which prohibited him from carrying firearms after he was committed under Section 302 at the age of 15. Id. at 720. The court granted summary judgment in favor of that plaintiff, holding that the federal statute was unconstitutional as applied to him. Id. at 722. The court noted that Pennsylvania does not have a system in place to grant relief to those who are disqualified from possessing a firearm under federal law after a state Section 302 commitment, but did not comment on whether a Section 302 commitment truly meant someone was mentally ill as contemplated by Heller. Id. at 719-22.

A court in this district, however, recently distinguished Keyes and Tyler and held that a Section 302 commitment was sufficient to consider someone mentally ill so that their right to keep and bear arms could be categorically denied. Simpson v. Sessions, No. 16-1334, 2017 WL 1910141, at *7 (E.D. Pa. May 10, 2017), appeal docketed, No. 17-2440 (3d Cir. Jul. 6, 2017). In Simpson, the plaintiff brought an as-applied challenge to the constitutionality of the federal statute, 18 U.S.C. § 922(g)(4), under the Second Amendment. Id. at *1. The plaintiff was committed under Section 302 in 2002, and therefore was prohibited from possessing firearms under Section 922(g)(4). Id. at *3. The court noted that the plaintiff had not offered enough evidence to demonstrate that he had overcome the mental illness that led to his Section 302 commitment, and held that he was still mentally ill such that he could be prohibited from purchasing firearms. Id. at *7.

While district courts disagree on whether a Section 302 commitment would place an individual outside of the protection of the Second Amendment under the federal law banning weapons to certain persons, in the instant case Plaintiffs bring a facial challenge to a state law, Section 6105 of the PUFA. In the Complaint, both Plaintiffs state that they were not, and never

26

have been, involuntarily committed on any other occasion or under any other provision of Pennsylvania law. (Doc. No. 1 at ¶¶ 34, 50.) Further, they allege that but for the [PUFA], they are eligible under Pennsylvania and federal law to possess firearms. (Id. at ¶¶ 37, 52.) Plaintiffs argue that they are prevented from exercising their Second Amendment right by Defendant Colonel Blocker's enforcement of the PUFA, due to the Section 302 commitments, and his role in reporting Plaintiffs as prohibited people in the PICS and NICS databases.[13] (Id.)

In any event, the mental illness exception to the protection afforded by the Second Amendment is not enough to support Defendants' position that there is no protected interest at stake. See Tyler, 837 F.3d at 690; Rehlander, 666 F.3d at 50; Keyes, 195 F. Supp. 3d 719-22. Rather, Plaintiffs have plausibly alleged in the Complaint that there is a protected interest here, and that the absence of any pre-deprivation procedures violates their Second Amendment right when supported by a Section 302 commitment. Moreover, it is also necessary here to determine whether Plaintiffs have plausibly alleged that the post-deprivation state remedies are not adequate to protect their Second Amendment rights, because courts have held such remedies may overcome pre-deprivation inadequacies.

### iv. Adequacy of Post-Deprivation State Remedies

As discussed, Pennsylvania provides three post-deprivation remedies. See 18 Pa. Cons. Stat. Ann. § 6105(f)(1); 18 Pa. Cons. Stat. Ann. § 6111.1(e), (g). Defendants argue that these post-deprivation procedures satisfy due process because the state does not need to provide a pre-deprivation hearing when the termination of the Second Amendment right to bear arms is justified by public health and safety concerns. (Doc. No. 13 at 15-22, 27-28.)

---

[13] The record is not fully developed on Plaintiffs' mental health history. A more in depth look at Plaintiffs' mental health history from the time of their Section 302 commitments to the present may or may not support their claim that the procedures in the Pennsylvania statute are inadequate. However, this specific information on their mental health is lacking at the Motion to Dismiss stage.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976). In evaluating whether the procedural protections are sufficient, a court must balance:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 424 U.S. at 335.

Based on the facts alleged in the Complaint, which are accepted as true at the Motion to Dismiss stage, the first Mathews v. Eldridge factor, the private interest that will be affected by the official action, weighs in favor of Plaintiffs. Plaintiffs, and those similarly situated, have a protected interest—the right to bear arms in self-defense in the home—that is affected by the official action of Defendant Colonel Blocker, the enforcement of Section 6105 of PUFA, and the carrying out of the state and federal reporting requirements against individuals who have been temporarily committed under Section 302.[14]

The second Mathews v. Eldridge factor, risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, weighs in favor of Plaintiffs. In the Complaint, Plaintiffs allege that "[e]very person subjected to a [t]emporary [e]mergency [c]ommitment, and for whom a physician issues a certification that the person is committable or that the inpatient treatment is necessary, is

---

[14] As discussed, a person committed under Section 302 of MHPA, "shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth. . . ." 18 Pa. Cons. Stat. Ann. § 6105(a)(1), (c)(4).

automatically divested immediately and indefinitely of his Second Amendment right to possess a firearm." (Doc. No. 1 at ¶ 73.)  Plaintiffs argue:

> Commitments under Section 302 are not ministerial because they involve fact-dependent analyses that call for the highly varied exercise of judgment by a diverse population of committing physicians.  The decision to commit an individual under Section 302 is based upon a physician's personal opinion that there are "reasonable grounds to believe that [the individual in question] is severely mentally disabled and in need of immediate treatment."  50 P.S. § 7302(a), (b).  After merely two hours, the physician must certify that the individual is a danger to [him]self or others, and the individual committed an act in furtherance thereof.  50 P.S. § 7302(b).  Because reasonable physicians might disagree as to whether a particular patient constitutes such a danger, especially given only two hours for evaluation, the risk of erroneous deprivation in the context of a Section 302 commitment is necessarily quite high.  Because of the limited duration of a Section 302 commitment, a physician may easily err on the side of finding a person committable.

(Doc. No. 14 at 23.)

Given both the state and federal reporting requirements, Plaintiffs have plausibly alleged the risk of an erroneous deprivation of the protected interest.  A Section 302 commitment only lasts a maximum of 120 hours.  50 Pa. Stat. § 7302(d).  The physician must report the Section 302 commitment to PSP within seven days of the commitment or treatment.  50 Pa. Stat. § 7109(d).  At an undetermined time after the physician fulfills their reporting duties under Section 109 of MHPA, PSP enters the reported individual in PICS and thereafter in the federal government database, NICS.  (Doc. No. 1 at ¶¶ 71-72.)

In the Complaint, Plaintiffs allege that an individual committed under Section 302 is provided no pre-deprivation notice of the potential consequences of the commitment, no right to a review by a neutral arbiter, no opportunity to make an oral presentation, no means of presenting evidence, no opportunity to cross-examine witnesses and to respond to evidence, no right to counsel, no pre-commitment review by a court of a decision based upon a written record.

(Id. at ¶ 58.)  Once an individual is committed under Section 302, the reporting requirements of both the factfinder physician and PSP are triggered.

If Plaintiff is correct in these assertions, a position that the Court must accept as true at the Motion to Dismiss stage, then the post-deprivation procedures available to restore the right to possess a firearm may be inadequate to overcome the constitutional harm a person has undergone.  Thus, Plaintiffs have plausibly alleged that the risk of an erroneous Section 302 commitment is high given the procedures that led to such a commitment.  Moreover, the relief afforded by the post-deprivation procedures available to cure the harm appears to be a remedy disproportionate to restore the constitutional right in question.

Further, although the Section 302 commitment is reported to the PSP within seven days of the commitment as part of the statutory scheme, the person has a "a reasonable period of time, not to exceed 60 days from the date of the imposition of the disability . . . in which to sell or transfer that person's firearms to another eligible person who is not a member of the prohibited person's household."  18 Pa. Cons. Stat. Ann. § 6105(a)(2)(i).  Plaintiffs argue that during this sixty (60) day period, "there could be an actual adjudication of whether the individual is a danger to himself or others."  (Doc. No. 30 at 19:18-20:1.)  This would be a valuable pre-deprivation procedural safeguard to protect a person's Second Amendment right.

During this sixty (60) day window, Plaintiffs argue, there should be some pre-deprivation procedures in place that would satisfy due process.  (Doc. No. 30 at 20:8-17.)  Plaintiffs claim that procedures should be in place after the Section 302 commitment, but before PSP enters an

individual's name into PICS and reports to NICS, to adjudicate more definitively whether a person is mentally ill.[15]  (Doc. No. 30 at 20:8-17.)

In this regard, Plaintiffs also argue that there is no immediate loss of a firearm, if a person committed under Section 302 already owns a firearm, because under the statute the person has sixty (60) days to surrender them.  18 Pa. Cons. Stat. Ann. § 6105(a)(2)(i).  Thus, the state is not motivated to act quickly, suggesting the individual is not such a danger to themselves or others. (Doc. No. 30 at 19:18-21:14.)  Consequently, Plaintiffs assert that there is "plenty of time [within that sixty (60) day window] for a process to be held where there could be an actual adjudication of whether the individual is a danger to themselves or others."  (Id. at 19:23-20:1.)

As the Third Circuit has noted:

a post-deprivation hearing that sufficiently provides the "procedural protections as the particular situation demands" may satisfy due process.  This is particularly so "where a state must act quickly," given the exigent circumstances.  Thus "[a]n important government interest, accompanied by a substantial assurance that the

---

[15]  PSP reporting polices are not a part of the record to date.  Plaintiffs indicated at oral argument that they would take discovery on the processes that the PSP use to report to PICS and NICS.  (Doc. No. 30 at 17:20-18:20.)  This information would be crucial to Plaintiffs' case based on procedural due process because the burden for a facial challenge is high.  See Salerno, 481 U.S. at 745.  As the Supreme Court wrote:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.  Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.

Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450-51 (2008) (internal citations and quotations omitted).

deprivation is not baseless or unwarranted," may justify "postponing the opportunity to be heard until after the initial deprivation."

Fanti v. Weinstock, 629 F. App'x 325, 330 (3d Cir. 2015) (internal citations omitted).  See also Gilbert v. Homar, 520 U.S. 924, 930 (1997) ("[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirement of the Due Process Clause.")  The sixty day window found in Section 6105(a)(2)(i), prior to the surrender of firearms, does not require that the state must act quickly in regard to individuals committed under Section 302.  This omission supports Plaintiffs' argument that there is value in enacting meaningful pre-deprivation procedures, in addition to the post-deprivation procedures, that would plausibly protect their procedural due process right, which is part of the second factor in the Mathews v. Eldridge interest balancing test.

Finally, the third Mathews v. Eldridge factor, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail, weighs in favor of the Government.  The Government has an important interest "in keeping firearms out of the hands of those who have ever been adjudicated mentally defective or who have ever been committed to a mental institution. . . .  The dangers inherent in the possession of firearms by the mentally ill are manifest."  In re Keyes, 83 A.3d 1016, 1026 (Pa. Super. Ct. 2013), appeal denied, 627 Pa. 766 (Pa. 2014).  Through PUFA and MHPA, Pennsylvania is regulating individuals committed to a mental institution pursuant to the state's concern for the public's safety, as well as the safety of the committed individuals.  (Doc. No. 14 at 30.)  Additionally, functionally and administratively, it is important to note that "a ruling of unconstitutionality frustrates the intent of the elected representatives of the people."  Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 451 (2008).

Plaintiffs counter that they are "not alleging that a hearing is required before committing an individual under Section 302. Rather they allege only that a pre-deprivation hearing was required before Defendants permanently divested Plaintiffs, and others similarly situated, of their Second Amendment rights as a result of such commitments."[16] (Doc. No. 14 at 24.)

In any event, given that the first two <u>Mathews v. Eldridge</u> balancing factors weigh in favor of Plaintiffs, they have plausibly alleged that the post-deprivation state remedies may not be sufficient procedural protections, and that pre-deprivation procedures—specifically post-Section 302 commitment and pre-Section 6105 surrender of firearms and reporting to PICS/NICS—do not protect their Second Amendment right sufficiently enough to satisfy due process concerns. Thus, accepting the facts alleged in the Complaint as true, which the Court must do at the Motion to Dismiss stage, Plaintiffs have plausibly alleged facts to satisfy the elements of a Fourteenth Amendment procedural due process claim.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 13) will be granted in part and denied in part. All claims against Defendants Governor Wolf, Attorney General Shapiro, and the Pennsylvania State Police will be dismissed. The Motion will be denied as to Defendant Colonel Blocker. An appropriate Order follows.

---

[16] Plaintiffs also argue that Section 302 automatically divests an individual of his or her Second Amendment right on both a state and federal level, because the PSP reporting requirements also trigger the bar under 18 U.S.C. § 922(g)(4). The First Circuit noted that "[t]he Attorney General can grant relief from firearms disability, 18 U.S.C. § 925(c), but Congress has prohibited action on such [restoration] petitions since 1992. <u>See</u> <u>Logan v. United States</u>, 552 U.S. 23, 28 n.1 (2007); <u>United States v. Booker</u>, 570 F. Supp. 2d 161, 164 n.2 (D. Me. 2008)." <u>Rehlander</u>, 666 F.3d at 49. This is significant because Plaintiffs argue that even if they restored their right to possess a firearm through one of the three post-deprivation procedures Pennsylvania offers, they may still not have their federal rights restored. (Doc. No. 30 at 18:11-19:12.) They argue that a Section 302 commitment automatically and permanently deprives an individual of his or her Second Amendment right without adequate due process. (<u>Id.</u> at 30:13-20.)