IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN DOE I, et. al.,

            Plaintiffs,

    v.

COLONEL ROBERT EVANCHICK,[1] in his
Official Capacity as Acting Commissioner of
the Pennsylvania State Police

            Defendant.

CIVIL ACTION
NO. 16-6039

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................ 3

II.     BACKGROUND .............................................................................................................. 4

    A.    Emergency Involuntary Commitment Under the Pennsylvania Mental Health
          Procedures Act ("MHPA") ............................................................................................. 5

    B.    Section 6105(c)(4) of the Pennsylvania Uniform Firearms Act ................................... 9

    C.    MHPA Reporting Requirements to the Pennsylvania State Police ............................. 10

    D.    State Statutory Remedies ............................................................................................. 13

    E.    Plaintiffs' Section 302 Commitments .......................................................................... 17

        1.    John Doe I ............................................................................................................... 17

---

[1] Plaintiffs originally filed this suit against Colonel Tyree Blocker in his official capacity as the Commissioner of the Pennsylvania State Police. Colonel Blocker has since retired. On March 22, 2018, Colonel Robert Evanchick was appointed to serve as Acting Commissioner of the Pennsylvania State Police. Under Federal Rule of Civil Procedure 25(d), when a public officer is a party to a suit in his individual capacity and the officer ceases to hold office while the action is still pending, the officer's successor is substituted in the suit. Fed. R. Civ. P. 25(d). Therefore, Colonel Evanchick is substituted for Colonel Blocker.

2. John Doe II ............................................................................................................. 20

III. STANDARD OF REVIEW ..................................................................................... 21

IV. ANALYSIS ............................................................................................................. 24

A. An Individual Committed Under Section 302 of the MHPA has a Protected
Liberty Interest in the Right to Bear Arms ............................................................. 26

B. Defendant's Enforcement of Section 6105(c)(4) of PUFA Does Not Deprive
Section 302 Committees of Their Right to Bear Arms Without Due Process ...... 31

1. A Section 302 Committee is not Entitled to Additional Pre-Deprivation
Procedures Before the Pennsylvania State Police Enter His Mental Health
Record in the PICS and NICS Databases ......................................................... 32

2. PUFA's Post-Deprivation Remedies Adequately Safeguard a Section 302
Committee's Due Process Rights ...................................................................... 38

V. CONCLUSION ......................................................................................................... 44

**OPINION**

**Slomsky, J.**                                                    **January 10, 2019**

## I.    INTRODUCTION

The parties' Cross-Motions for Summary Judgment present a single issue: whether Defendant's enforcement of a Pennsylvania law prohibiting an individual who has been temporarily committed for mental health reasons from owning a firearm violates the United States Constitution by depriving that individual of his right to bear arms without due process of law. (Doc. Nos. 61, 65.)

On November 17, 2016, Plaintiffs John Doe I and John Doe II ("Plaintiffs") filed this procedural due process claim against Defendants Governor Thomas W. Wolf, Attorney General Bruce R. Beemer, Colonel Tyree V. Blocker, and the Pennsylvania State Police.[2]  Plaintiffs are individuals who attempted to purchase firearms for self-defense in their homes, but were prohibited from doing so by Section 6105(c)(4) of the Pennsylvania Uniform Firearms Act ("PUFA"), which bans individuals who have been temporarily committed under Section 302 of the Pennsylvania Mental Health Procedures Act ("MPRA") from possessing firearms.  In this procedural due process action seeking injunctive and declaratory relief, Plaintiffs bring a facial challenge to Section 6105(c)(4), alleging that it deprives them, and all other similarly-situated individuals committed under Section 302, of their right to bear arms without due process of law. (Doc. No. 1.)

---

[2]  On January 17, 2017, Josh Shapiro replaced Bruce R. Beemer as the Commonwealth of Pennsylvania Attorney General.  Under Federal Rule of Civil Procedure 25(d), Attorney General Shapiro was substituted for Mr. Beemer as a defendant in this case.  (Doc. No. 33 at 3.)

Governor Wolf, the Attorney General, and the Pennsylvania State Police were dismissed from this action at the Motion to Dismiss stage. (Doc. No. 34.) Now, only one Defendant remains: Colonel Robert Evanchick ("Defendant"), who replaced Colonel Blocker as Commissioner of the Pennsylvania State Police. (Doc. Nos. 61, 65.)

On March 12, 2018, several months after the Court denied Defendant's Motion to Dismiss, the parties filed a stipulation in which Defendant Colonel Evanchick consented to substitute the original John Doe II with a new John Doe II. (Doc. No. 41.) That same day, Plaintiffs filed an Amended Complaint in which they alleged facts pertaining to the new John Doe II. (Doc. No. 42.)

On October 29, 2018, the parties filed Cross-Motions for Summary Judgment. (Doc. Nos. 61, 65). On November 19, 2018, both parties filed Responses in Opposition to the respective Motions for Summary Judgment. (Doc. Nos. 69, 70). Finally, on November 26, 2018, Plaintiffs filed a Reply to Defendant's Response in Opposition to their Motion. (Doc. No. 72.)

The Motions are now ripe for review.[3] For reasons discussed infra, Plaintiffs' Motion for Summary Judgment (Doc. No. 61) will be denied, and Defendant's Motion for Summary Judgment (Doc. No. 65) will be granted.

## II.  BACKGROUND

Plaintiffs mount a facial challenge to Section 6105(c)(4) of the PUFA. As such, they do not merely assert that Section 6105(c)(4) is unconstitutional as it applies to them; rather, they

---

[3]  In reaching a decision, the Court considered Plaintiffs' Motion for Summary Judgment (Doc. No. 61), Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment (Doc. No. 62), Plaintiffs' Statement of Undisputed Facts in Support of their Motion (Doc. No. 63), Defendant's Motion for Summary Judgment (Doc. No. 65), Defendant's Statement of Undisputed Facts in Support of His Motion (Doc. No. 66), Plaintiffs' Response in Opposition to Defendant's Motion (Doc. No. 69), Plaintiffs' Response to Defendant's Statement of Undisputed Facts (Doc. No. 70), Defendant's Response in Opposition to Plaintiff's Motion (Doc. No. 71), Plaintiffs' Reply to Defendant's Response in Opposition to their Motion (Doc. No. 72), and the parties' Joint Statement of Facts Not in Dispute (Doc. No. 55).

contend that, on its face, the statute denies every individual committed under Section 302 of his right to bear arms without procedural due process.[4] (Doc. No. 61.) To address this contention, the Court will first set forth the relevant statutory scheme, and then discuss Plaintiffs' respective Section 302 commitments and mental health history.

### A. Emergency Involuntary Commitment Under the Pennsylvania Mental Health Procedures Act ("MHPA")

In Pennsylvania, an individual may be subjected involuntarily to a temporary emergency commitment for up to 120 hours under Section 302 of the Pennsylvania Mental Health Procedures Act ("MHPA") if "the person is severely mentally disabled and in need of immediate treatment." 50 Pa. Stat. § 7302. This is known as a Section 302 commitment. Section 301, which defines persons subject to involuntary emergency examination and treatment under Section 302, provides as follows:

> Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 Pa. Stat. § 7301. Section 301 also sets forth the standard for determining whether an individual presents a clear and present danger of harm to others or to himself:

> Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated. . . . For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

---

[4]  Plaintiffs do not challenge the validity of their Section 302 commitments or the constitutionality of Section 302. (Doc. No. 42 ¶ 6.) According to the Amended Complaint, "[t]hey seek only the narrow relief of preventing the automatic imposition of an indefinite loss of their Second Amendment rights without due process of law that arises out of their Emergency Commitments under Section 302." (Id.)

50 Pa. Stat. § 7301(b)(1). Under Section 301(b)(2), "clear and present danger" can be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 Pa. Stat. § 7301(b)(2).

A Section 302 commitment is initiated in one of two ways. First, a "physician or responsible party"[5] may make a written application to the county administrator "setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of medical treatment." 50 Pa. Stat. § 7302(a)(1). Upon receipt of the written application, "the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant." Id. Second, "a physician or peace officer, or anyone authorized by the county administrator may take such a person to an approved facility for an emergency examination" upon "personal observation of the conduct . . . constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate

---

[5] The term "responsible party" is not defined in the MHPA.

treatment." 50 Pa. Stat. § 7302(a)(2). If an individual is taken to a treatment facility without a warrant, the person transporting the individual must "make a written statement setting forth the grounds for believing the person to be in need of such examination." Id.

An individual transported to a treatment facility under Section 302 must be examined by a physician within two hours of his arrival to determine if he poses a clear and present danger to himself or others and if he is in need of immediate treatment. 50 Pa. Stat. § 7302(b). If the physician determines that the person is "severely mentally disabled and in need of emergency treatment," the treatment shall begin immediately. Id. If instead the physician finds that there is no need for emergency treatment, or if at any time it appears that emergency treatment is no longer required, the individual must be discharged. Id. Additionally, Section 302 requires the physician to make a record of the examination and his findings. Id.

An individual temporarily committed under Section 302 must be notified of his rights. Section 302 sets forth those rights as follows:

> Upon arrival at the facility, the person shall be informed of the reasons for emergency examination and of his right to communicate immediately with others. He shall be given reasonable use of the telephone. He shall be requested to furnish the names of parties whom he may want notified of his custody and kept informed of his status. The county administrator or the director of the facility shall:
>
> (1) give notice to such parties of the whereabouts and status of the person, how and when he may be contacted and visited, and how they may obtain information concerning him while he is in inpatient treatment; and
>
> (2) take reasonable steps to assure that while the person is detained, the health and safety needs of any of his dependents are met, and that his personal property and the premises he occupies are secure.

50 Pa. Stat. § 7302(c)(1)-(2).  A mental health treatment facility notifies a Section 302 committee of these rights by providing him with mental health provider forms, which have been developed by the Pennsylvania Department of Human Services.[6]  (Doc. No. 55 ¶ 3.)

Sections 303 and 304 of the MPHA allow a treatment facility to extend a Section 302 commitment past 120 hours if the facility determines that the individual continues to need medical treatment.  50 Pa. Stat. §§ 7303, 7304.  A Section 303 commitment allows a facility to extend a temporary commitment "for a period not to exceed 20 days."  50 Pa. Stat. § 7303(f).  To extend a Section 302 commitment under Section 303, the facility must file an application in the court of common pleas which states the grounds on which extended emergency treatment is believed to be necessary.  Id.  "The application shall state the name of any examining physician and the substance of his opinion regarding the mental condition of the person."  Id.

Upon receipt of the Section 303 application, the court of common pleas must appoint counsel to represent the individual, unless the person can afford private representation.  Within 24 hours of filing the application, "an informal hearing shall be conducted by a judge or by a mental health review officer and, if practicable, shall be held at the facility."  50 Pa. Stat. § 7303(b).  At the informal hearing, the committee has the following rights:

> At the commencement of the informal conference, the judge or the mental health review officer shall inform the person of the nature of the proceedings.  Information relevant to whether the person is severely mentally disabled and in need of treatment shall be reviewed, including the reasons that continued involuntary treatment is necessary.  Such explanation shall be made by a physician who examined the person and shall be in terms understandable to a layman.  The judge or mental health review officer may review any relevant information, even if it would normally be excluded under rules of evidence if he believes that such information is reliable.  The person or his representative shall have the right to ask

---

[6]   The Pennsylvania State Police has no involvement in the procedures leading to a Section 302 commitment.  The PSP is not responsible for notifying a Section 302 committee of his rights under § 7302(c)(1)-(2).  (Doc. No. 55 ¶¶ 1, 4.)

questions of the physician and of any other witnesses and to present any relevant information. At the conclusion of the review, if the judge or the review officer finds that the person is severely mentally disabled and in need of continued involuntary treatment, he shall so certify. Otherwise, he shall direct that the facility director or his designee discharge the person.

50 Pa. Stat. § 7303(c)(1).

Like Section 303, Section 304 of the MPHA allows a treatment facility to extend a Section 302 commitment. Section 304 allows a facility to extend a temporary commitment "for a period not to exceed 90 days" if the individual still continues to require emergency mental health treatment. 50 Pa. Stat. §§ 7304(a)(1), (g). Before committing an individual under Section 304, a judge or mental health review officer must hold a hearing, at which the individual is guaranteed the right to counsel, the assistance of an expert in mental health, the right to confront and cross-examine witnesses, and the right to present evidence on his own behalf. 50 Pa. Stat. § 7304(e). If the judge or mental health review officer finds by clear and convincing evidence that the individual is severely mentally disabled and in need of ongoing mental health treatment, the individual's Section 302 commitment may be extended for up to 90 days. 50 Pa. Stat. §§ 7304(f), (g).

**B.      Section 6105(c)(4) of the Pennsylvania Uniform Firearms Act**

The Pennsylvania Uniform Firearms Act ("PUFA") regulates the use of firearms in Pennsylvania. See 18 Pa. Cons. Stat. Ann. § 6101, et seq. At issue here is Section 6105 of the PUFA, which identifies individuals who are prohibited from possessing firearms. 18 Pa. Cons. Stat. Ann. § 6105. Section 6105(a) provides that a person "whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth." 18 Pa. Cons. Stat. Ann. § 6105(a).

18 Pa. Cons. Stat. Ann. § 6105(a)(1).  Under subsection (c)(4), the following persons "shall be subject to the prohibition of subsection (a)":

> A person who has been adjudicated as an incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under section 302, 303 or 304 of the provisions of the act of July 9, 1976 (P.L. 817, No. 143), known as the Mental Health Procedures Act. This paragraph shall not apply to any proceeding under section 302 of the Mental Health Procedures Act unless the examining physician has issued a certification that inpatient care was necessary or that the person was committable.

Id. § 6105(c)(4). As a result of this subsection, a person temporarily committed and certified under Section 302 of MHPA, as described above, is prohibited from possessing a firearm in Pennsylvania.  Id.

An individual prohibited from possessing a firearm under Section 6105(a) has a "reasonable period of time, not to exceed 60 days from the date of the imposition of the disability under this subsection, in which to sell or transfer that person's firearms to another eligible person who is not a member of the prohibited person's household."  Id. § 6105(a)(2)(i).  Essentially, if a person temporarily committed under Section 302 owns a firearm at the time of his commitment, he has 60 days to sell or transfer the firearm to someone outside his family.

### C.      MHPA Reporting Requirements to the Pennsylvania State Police

Section 6105 of the PUFA is enforced by the Pennsylvania State Police, which is responsible for reporting a Section 302 commitment to the Pennsylvania Instant Check System ("PICS"), the state firearms background check database maintained by the PSP, and the National Instant Criminal Background Check System ("NICS"), the federal firearms background check database maintained by the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives.

The MHPA requires that the PSP be notified of any individual who has been temporarily committed under Section 302.  Section 109 of the MPHA provides as follows:

> Notwithstanding any statute to the contrary, judges of the courts of common pleas, mental health review officers and county mental health and mental retardation administrators shall notify the Pennsylvania State Police on a form developed by the Pennsylvania State Police of the identity of any individual who has been adjudicated incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under this act or who has been involuntarily treated as described under 18 Pa. Con. Stat. Ann. § 6105(c)(4) (relating to persons not to possess, use, manufacture, control, sell or transfer firearms).  The notification shall be transmitted by the judge, mental health review officer or county mental health and mental retardation administrator within seven days of the adjudication, commitment or treatment.  Notwithstanding any statute to the contrary, county mental health and mental retardation administrators shall notify the Pennsylvania State Police on a form developed by the Pennsylvania State Police of the identity of any individual who before the effective date of this act had been adjudicated incompetent or had been involuntarily committed to a mental institution for inpatient care treatment under this act or had been involuntarily treated as described in 18 Pa. Con. Stat. Ann. § 6105(c)(4).

50 Pa. Stat. § 7109(d).  In short, whenever an individual is involuntarily committed under Section 302, a judge on the courts of common pleas, a mental health review officer, or a county mental health administrator must notify the PSP within seven days of the individual's commitment.  (Doc. No. 55 ¶ 9.)

Notice of a Section 302 commitment is sent to the PICS Unit of the PSP Firearm Division. (Id. ¶ 11.)  The notice must contain the committed individual's name, date of birth or Social Security number, physical description, date of commitment, and the name of the notifying mental health treatment facility, agency, or county.  (Id. ¶ 12.)  The PSP does not examine the evidence used by the treating physician to certify the Section 302 commitment.  (Id. ¶ 16.)  Nor does the PSP confirm that the treating physician is licensed.  (Id. at ¶ 15.)  Instead, the PSP relies upon the reporting entity to provide complete and accurate information, as required by 37 Pa. Code § 33.120(b).[7]  (Id. ¶ 16.)

---

[7]   37 Pa. Code § 33.120(b) provides as follows:

When the PSP confirms that the Section 302 commitment notice contains the required information, it creates a mental health record in the PICS database, the state firearms background check database maintained by the PSP. (Id. ¶ 17.) The PSP then automatically transfers the mental health record to NICS, the national firearms backgrounds check database.[8] (Id. ¶ 21.) Once the required information is posted in the PICS and NICS databases, the individual is prohibited from possessing, using, controlling, selling, or transferring firearms in Pennsylvania and nationwide. 18 Pa. Cons. Stat. Ann. §§ 6105(a), (c)(4); 18 U.S.C. § 922(g)(4).[9] The PSP does not

---

It is the responsibility of the judges of the courts of common pleas, mental health review officers and county mental health and mental retardation administrators to ensure the notification provides complete and accurate information. The notification shall include: The full name of the individual who was involuntarily committed or adjudicated incompetent, at least one numeric identifier (date of birth or Social Security number, or both), and physical description; notification of the type of commitment and date of the commitment or adjudication of incompetence; the county submitting the information, and name, address and telephone number of the notifying official; examining physician's certification on 302 commitments; facility where the commitment occurred; court case number and date of court order, where applicable. The notification shall be made to the State Police by the judges of the courts of common pleas, mental health review officers and mental health and mental retardation administrators within 7 days of the adjudication, commitment or treatment, or determination by an examining physician of the lack of severe mental disability following the initial commitment as set forth in subsection (a), by the form and format prescribed by the State Police. Notification made by mail, shall be directed to the Pennsylvania State Police, Attention: Firearm Division, PICS Operations, 1800 Elmerton Avenue, Harrisburg, PA 17110. The envelope shall be marked "Confidential."

[8] According to the Joint Stipulation of Facts Not In Dispute, federal law does not require the PSP to transfer mental health records to NICS. Instead, "[b]eginning in 2013, [the Federal Bureau of Alcohol, Firearms, Tobacco and Explosives] began accepting mental health records from PSP and PSP voluntary began transmitting previously created and new mental health records to NICS, including mental health records for Section 302 committees." (Doc. No. 55 ¶ 22, 23.)

[9] Section 922(g)(4) provides as follows:

It shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm

notify a Section 302 committee before it creates a mental health record of his Section 302 commitments in the PICS and NICS databases. (Doc. No. 55 ¶ 5.) Nor does the PSP notify a Section 302 committee that he is prohibited owning a gun under state and federal law by virtue of his Section 302 commitment. (Id. ¶ 4.) It is at this point in the statutory scheme that Plaintiffs claim Defendant's enforcement of Section 6105(c)(4) deprives a Section 302 committee of his Second Amendment rights without due process of law. (Doc. No. 63 ¶¶ 80-81.)

### D. State Statutory Remedies

There are three post-deprivation procedures available to an individual who seeks to lift the firearm restriction imposed by Section 6105(c)(4) of PUFA as a result of a Section 302 commitment. (Id. ¶ 2.) First, under Section 6105(f)(1) of PUFA, an individual can file a petition in the court of common pleas, asserting that he is no longer mentally ill and should be allowed to own a gun. Section 6105(f)(1) provides the following:

> Upon application to the court of common pleas under this subsection by an applicant subject to the prohibitions under subsection (c)(4), the court may grant such relief as it deems appropriate if the court determines that the applicant may possess a firearm without risk to the applicant or any other person.

18 Pa. Cons. Stat. Ann. § 6105(f)(1). A petition made pursuant to Section 6105(f)(1) is reviewed in a civil proceeding in a state court of common pleas with a full evidentiary hearing. (Doc. No. 66 ¶ 49.) According to the declaration of PSP Major Scott Price, who is the Acting Deputy Commissioner of Administration and Professional Responsibility, the parties at the evidentiary hearing can present documentary and testimonial evidence and have the right to cross-examine

---

or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(4).

witnesses about the petitioner's current mental health as it relates to his ability to safely possess a firearm.[10]  (Id. at 15 ¶ 12.)

If the petitioner demonstrates that he can possess a firearm without risk to himself or another person, the state firearm prohibition is lifted.  The PSP logs into the PICS database and makes a notation that the petitioner is no longer prohibited from possessing a firearm under Pennsylvania law.  Notably, a successful Section 6105(f)(1) petition cannot lift the petitioner's federal prohibition.  (Id. ¶ 50.)

Second, under Section 6111.1(g)(2) of PUFA, an individual can attempt to have his Section 302 commitment expunged by petitioning the court to review the sufficiency of the evidence upon which the commitment was based.  In relevant part, Section 6111.1(g)(2) states the following:

> A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based.  If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged.  A petition filed under this subsection shall toll the 60-day period set forth under section 6105(a)(2).

18 Pa. Cons. Stat. Ann. § 6111.1(g)(2) (footnote citing to Section 302 omitted).[11]  The Supreme Court of Pennsylvania recently addressed the standard of review under Section 6111.1(g)(2):

---

[10]  According to the transcript of Major Price's deposition testimony, he was designated as the representative of Colonel Robert Evanchick in his official capacity as the Commissioner of the Pennsylvania State Police to give testimony on his behalf.  (Doc. No. 63-2 at 6:9-23.)  Prior to his position as Acting Deputy Commissioner of Administration and Professional Responsibility, Major Price served as Director of the PSP Bureau of Records and Identification and oversaw the Firearms Division.  (Id. at 9:8-14.)

[11]  The remainder of Section 6111.1(g) addresses when PSP must expunge an individual's mental health records.  It provides:

> (1) Upon receipt of a copy of the order of a court of competent jurisdiction which vacates a final order or an involuntary certification issued by a mental health review

[T]he plain language of section 6111.1(g)(2) directs a trial court to review the physician's findings, made at the time of the commitment, to determine whether the evidence known by the physician at the time, as contained in the contemporaneously-created record, supports the conclusion that the individual required commitment under one (or more) of the specific, statutorily-defined circumstances.

\* \* \*

[U]nder section 6111.1(g)(2), a challenge to the sufficiency of the evidence to support a 302 commitment presents a pure question of law, and the court's sole concern is whether, based on the findings recorded by the physician and the information he or she relied upon in arriving at those findings, the precise, legislatively-defined prerequisites for a 302 commitment have been satisfied and are supported by a preponderance of the evidence. We emphasize that the trial court's review is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings, and requires deference to the physician, as the original factfinder, as the physician examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary.

In re Vencil, 152 A.3d 235, 242, 246 (Pa. 2017). Accordingly, a state court's review of a Section 6111.1(g)(2) petition is limited and the court must give deference to the treating physician as the original factfinder. Id. at 246.

If the petitioner demonstrates that the evidence upon which the Section 302 commitment was based was insufficient to support the commitment, the court will order the record expunged.

---

officer, the Pennsylvania State Police shall expunge all records of the involuntary treatment received under subsection (f).

\* \* \*

(3) The Pennsylvania State Police shall expunge all records of an involuntary commitment of an individual who is discharged from a mental health facility based upon the initial review by the physician occurring within two hours of arrival under section 302(b) of the Mental Health Procedures Act and the physician's determination that no severe mental disability existed pursuant to section 302(b) of the Mental Health Procedures Act. The physician shall provide signed confirmation of the determination of the lack of severe mental disability following the initial examination under section 302(b) of the Mental Health Procedures Act to the Pennsylvania State Police.

18 Pa. Cons. Stat. Ann. § 6111.1(g)(1), (3).

Upon receipt of the court's order, the PSP will remove any record of petitioner's Section 302 commitment from the PICS database, which in turn will erase the Section 302 commitment from the NICS database. (Id. ¶ 54; Doc. No. 63 ¶ 61.) Thus, a successful Section 6111.1(g)(2) petition fully restores an individual's right to possess a firearm under both state and federal law. (Doc. No. 63 ¶ 61.)

Finally, under Section 6111.1(e) of PUFA, an individual can submit a challenge to the PSP that contests the accuracy of his mental health record. Section 6111.1(e) states:

> (1) Any person who is denied the right to receive, sell, transfer, possess, carry, manufacture or purchase a firearm as a result of the procedures established by this section may challenge the accuracy of that person's criminal history, juvenile delinquency history or mental health record pursuant to a denial by the instantaneous records check by submitting a challenge to the Pennsylvania State Police within 30 days from the date of the denial.

> (2) The Pennsylvania State Police shall conduct a review of the accuracy of the information forming the basis for the denial and shall have the burden of proving the accuracy of the record. Within 20 days after receiving a challenge, the Pennsylvania State Police shall notify the challenger of the basis for the denial, including, but not limited to, the jurisdiction and docket number of any relevant court decision and provide the challenger an opportunity to provide additional information for the purposes of the review. The Pennsylvania State Police shall communicate its final decision to the challenger within 60 days of the receipt of the challenge. The decision of the Pennsylvania State Police shall include all information which formed a basis for the decision.

> (3) If the challenge is ruled invalid, the person shall have the right to appeal the decision to the Attorney General within 30 days of the decision. The Attorney General shall conduct a hearing de novo in accordance with the Administrative Agency Law. The burden of proof shall be upon the Commonwealth.

> (4) The decision of the Attorney General may be appealed to the Commonwealth Court by an aggrieved party.

18 Pa. Cons. Stat. Ann. § 6111.1(e). Under this provision, an individual has the right to appeal the PSP's decision to the Pennsylvania Office of Attorney General, where an Administrative Law

Judge will hold a <u>de novo</u> hearing. § 6111.1(e)(3); (Doc. No. 66 ¶ 43). The Administrative Law Judge's decision may be appealed to the Pennsylvania Commonwealth Court. § 6111.1(e)(4).

According to statistics provided by the PSP, forty-one (41) Section 302 committees pursued one or more of these procedures to attempt to restore their firearm rights between January 1, 2017 and December 31, 2017. Of that number, seventeen (17) committees were successful. (Doc. No. 65 at 26.) Here, neither Plaintiff has pursued any of the three post-deprivation remedies to restore his firearm rights. (Doc. No. 63 ¶ 97.)

### E. Plaintiffs' Section 302 Commitments

#### 1. John Doe I

John Doe I, who was 23 years old as of August 15, 2018, currently works in Somerset County, Pennsylvania as an electrician. (Doc. No. 63-5 at 1.) When he was 16 years old, he became "melancholy as a result of pervasive bullying at school." (Doc. No. 63-4 ¶ 2.) Around that time, administrators at his high school contacted John Doe I's mother because they were worried that he planned to harm himself after a romantic relationship soured. As a result, on September 13, 2011, John Doe I's mother took him to the emergency room of Somerset Hospital, where he remained from 11 a.m. until 6 p.m. (Doc. No. 63 ¶ 99.)

Upon arriving at Somerset Hospital, John Doe I was evaluated by Dr. George Groftisza to determine whether he should be committed under Section 302. In his medical examination report, Dr. Groftisza wrote the following:

HISTORY OF PRESENT ILLNESS:

This is a[n] [individual] who presents to the emergency room with mom. Apparently sent here by MH/MR. Apparently patient did see his high school counsellor yesterday at [school]. Apparently he is sort of depressed, has been having problems stating that he has emotional problems and people are not caring enough for him. The patient did use a knife and cut himself. He has multiple small superficial lacerations to the left forearm palmer aspect and again was seen by MH/MR and sent here for further evaluation and management.

PAST MEDICAL HISTORY:

Compatible with history of previous cutting behavior, however, I am not sure of the date of this. The patient has never been seen by a psychiatrist. Has never gone to a type of counsellor per se previously to this event. The patient is not really sure why he is depressed but he tells me that he did want to hurt himself last night.

(Doc. No. 63-5 at 6.) After his evaluation, Dr. Groftisza concluded that John Doe I suffered from "[d]epression with cutting behavior," and [q]uestionable suicidal ideation," and noted that his forearm had multiple superficial lacerations. (Id. at 7.) Consequently, Dr. Groftisza determined that John Doe I was "committable" under Section 302. He then completed and signed a Section 302 Application for Involuntary Examination and Treatment, in which he explained that John Doe I was a clear and present danger to himself and that there was a reasonable probability that he would commit suicide without emergency treatment. (Id. at 15.) Additionally, Dr. Groftisza recommended that John Doe I be transferred to Aloysius Hall at the Conemaugh Medical Center for Section 302 emergency inpatient treatment. (Id. at 7.) Summer McQuown, a County Administrator, also signed John Doe I's Section 302 Application for Involuntary Examination and Treatment. (Id. at 16.)

Nevertheless, John Doe I left the Somerset Hospital later that evening with his mother against medical advice. (Id. at 9.) In an addendum to his medical report, Dr. Groftisza noted the following:

We were planning to send this patient to Aloysia for further evaluation and management, however mom is completely against this, apparently she had a long talk with her son and apparently the issues here do not involve suicidal intent according to mom, apparently he just wanted to make sure people think of him a little more often and again he tells me he in no way is considering basically killing himself [sic]. He just wanted to release some emotion as per the patient. However, I would strongly suggest to mom to reconsider, however, mom states that she knows her son well, this is not a problem. She will be with him 24 hours a day until she sees a counselor tomorrow . . . and does not want [John Doe I] sent to Aloysia. I did have also MH/MR personnel here . . . and again mom is adamant and the patient

himself tells me that he has no problems of actually killing himself, he just wanted to apparently get some attention, but this is vague as well . . . . Subsequently mom will be signing out against medical advice.

(Id.) After being discharged, John Doe I sought outpatient treatment and saw a mental health counselor for six months. (Id. at 2.) He contends that he was told that the Section 302 commitment would not appear on his record. (Id.)

At some point after Dr. Groftisza certified that John Doe I was committable under Section 302, a notice of his commitment was sent to the PSP. Pursuant to Section 6105(c)(4), the PSP created a mental health record for John Doe I in the PICS database, and thereafter transmitted the mental health record to the NICS database. John Doe I contends that he was never notified of the legal consequences of his Section 302 commitment. (Id.) In the fall of 2015, John Doe I attempted to purchase a firearm for "self-defense in [his] home," but was prevented from doing so "when [his] PICS/NICS background check revealed that [he] had been subject to an involuntary emergency commitment under Section 302." (Doc. No. 63-4 ¶¶ 15-16.)

On August 15, 2018, Kenneth J. Weiss, M.D., conducted a psychiatric evaluation of John Doe I for the purposes of this litigation and to determine his fitness to possess a firearm. In his report, he concluded as follows:

Having examined Mr. Doe I and reviewed pertinent records, the following opinions are expressed within a reasonable degree of medical certainty: Mr. Doe I is mentally healthy young adult, stable and functional, who has no subjective complaints and shows no objective signs of mental disease. To this examiner's knowledge, he has had a life free of psychological traumas and issues, with the exception of the psychosocial problems he described in 2011. His description of the events in question are substantially congruent with the records. Mr. Doe I, as a troubled teenager with no outlet for discussing the problems he faced, called for help by scratching his wrist and presenting to the school counselor, whom he knew. Unfortunately, his gesture was interpreted as self-destructive behavior, and his declining to sign into the psychiatric unit of the hospital triggered the emergency commitment. It is highly significant that, upon closer inspection by clinicians, his condition was seen for what it was: reaching out for an entry point into mental health care. Even the clinical record from Somerset indicates "questionable

suicidal ideation." The outpatient care he received was successful and, to this examiner's knowledge, he has not had a recurrence. Accordingly, there would be no basis for considering him to be mentally ill or defective currently, and considering the circumstances of the 2011 incident, he is mentally fit to have his firearms rights restored. In my opinion, from a psychiatric perspective, Mr. Doe I no longer suffers from the condition that was the basis for the 302 commitment, does not require ongoing mental health care, and does not pose a danger to himself or others.

(Id. at 3.)

### 2.    John Doe II[12]

John Doe II, who was 47 years old as of August 16, 2018, currently works as a maintenance manager at a power plant in Northampton County, Pennsylvania. (Doc. No. 63-7 at 1.) In August of 1996, John Doe II lived in Easton, Pennsylvania with his first wife. (Doc. No. 63-6 ¶ 2.) Around that time, John Doe II and his wife began experiencing marital problems that stemmed from rumors that John Doe II's wife was having an affair. (Id. ¶ 3.) One evening, in an attempt to force the truth from his wife, John Doe II got drunk, fashioned a noose, and threatened to hang himself. (Id. ¶¶ 4-5.) In response, his wife called the police and reported that John Doe II was threatening suicide. (Id. ¶ 6.) When the police arrived at his home, they took him into custody and gave him two options: either the police could take him to a prison holding cell, or they could transport him to the hospital for an emergency medical evaluation. (Id. ¶ 7.) He chose the latter option. (Id.)

Later that evening, John Doe II was taken to Muhlenberg Hospital where he was confined to a locked room for several hours. (Id. ¶¶ 8-13.) According to his declaration, he "waited in [his]

---

[12]    As noted above, on March 12, 2018, the parties filed a stipulation in which Colonel Evanchick consented to the substitution of the original John Doe II with a new John Doe II. (Doc. No. 41.) In the Complaint, which was filed November 17, 2016, Plaintiff John Doe II was an individual who had been committed under Section 302 after being intoxicated and uncooperative at the Grandview Hospital in Sellersville, Pennsylvania. (Doc. No. 1.) In the Amended Complaint, which was filed March 12, 2018, Plaintiffs pled facts relating to the current John Doe II. (Doc. No. 42.)

room, slept, and was eventually released with almost no inquiry from hospital staff." (Id. ¶ 12.) He claims that while confined at Muhlenberg Hospital, no one informed him that he had been involuntarily committed under Section 302. (Id. ¶ 14.) Furthermore, he claims that he did not know about the Section 302 commitment or its legal consequences until 2015, when he attempted to purchase a firearm for self-defense in his home but was denied after a PICS/NICS background check. (Id. ¶¶ 22-23.)

On August 16, 2018, Kenneth J. Weiss, M.D., conducted a psychiatric evaluation of John Doe II for the purposes of this litigation and to determine his fitness to possess a firearm. In his report, he concluded the following:

> Having examined Mr. Doe II and reviewed pertinent records, the following opinions are expressed within a reasonable degree of medical certainty: Mr. Doe II underwent an adjustment problem (marital problems) in 1995, probably fueled by alcohol, that led to his being overly dramatic. This, in turn, brought about a series of events which, 20 years later were revealed as a 302 commitment. To the best of this examiner's knowledge, Mr. Doe II had no antecedent psychiatric history or further adjustment problems since the 1995 incident.[13] The records surrounding the Easton/Muhlenberg medical care are not available as they were destroyed due to the age of the records. However, the State Police have confirmed that Mr. Doe II has no criminal convictions. Having considered the matter, I conclude that Mr. Doe II's transitory disturbance in 1995 has no implications for public safety today; he is neither a danger to himself nor to others. Mr. Doe II is neither mentally defective nor mentally disturbed. Accordingly, there is no psychiatric bar to his being considered a proper and fit candidate for restoration of his firearm rights.

(Doc. No. 63-7 at 3.) As noted in Dr. Weiss's psychiatric evaluation report, the medical records from John Doe II's Section 302 commitment have been destroyed. (Id.)

III. **STANDARD OF REVIEW**

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

---

[13] In his declaration, John Doe II states that he threatened suicide in August 1996, but in the medical report, Dr. Weiss states that the incident occurred in 1995. (Doc. No. 63-6 ¶ 2; Doc. No. 63-7 at 3.)

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247-249. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the

potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.[14] Id. at 250.

"The same standards and burdens apply on cross-motions for summary judgment." Allah v. Ricci, 12-4095, 2013 WL 3816043 (3d Cir. July 24, 2013) (citing Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir.1987)). When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same. Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F.Supp.2d 425, 430 (M.D.Pa.2006). "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" Id. (quoting Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir.2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." Id. (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir.1998)).

---

[14] In their Reply, Plaintiffs point out that although Defendant filed a Statement of Undisputed Facts, he did not file a responsive factual statement that controverted Plaintiffs' Statement of Undisputed Facts or identified genuine issues of material fact to be tried. (Doc. No. 72.) As a result, Plaintiffs argue that this Court's procedures dictate that all of their Undisputed Facts "be admitted." (Id.) While the Court's procedures do indeed state that "[a]ll material facts set forth in the statement required to be served by the moving party shall be admitted unless controverted by the opposing party," the Court is not required to admit legal conclusions embedded in a party's statement of facts. JUDGE SLOMSKY'S SCHEDULING AND MOTION POLICIES AND PROCEDURES, http://www.paed.uscourts.gov/documents/procedures/slopol2.pdf (updated June 2016). Here, Plaintiffs argue that the Court should admit the statement that "[t]here is no dispute that none of the post-deprivation procedures can remedy the resulting permanent deprivation under PUFA Section 6105(c)(4) of Second Amendment rights." (Doc. No. 72 at 3.) The Court will not grant Plaintiffs' request. First, the Court is under no obligation to admit a legal conclusion. Second, this legal conclusion is strongly opposed in the body of Defendant's Motion for Summary Judgment. (See Doc. No. 65 at 18.)

As noted above, Plaintiffs mount a facial challenge to Section 6105(c)(4). A facial challenge "seeks to vindicate not only [plaintiff's] own rights, but those of others who may also be adversely impacted by the statute in question." <u>City of Chicago v. Morales</u>, 527 U.S. 41, 55 n.22 (1999). In contrast, "[a]n as-applied . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." <u>U.S. v. Marcavage</u>, 609 F.3d 264, 273 (3d Cir. 2010). Courts generally disfavor facial challenges. <u>Washington State Grange v. Washington State Republican Party</u>, 552 U.S. 442, 450 (2008). The Supreme Court has explained why:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." <u>Sabri v. United States</u>, 541 U.S. 600, 609 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" <u>Ashwander v. TVA</u>, 297 U.S. 288, 346-347 (1936) (Brandeis, J., concurring) (quoting <u>Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration</u>, 113 U.S. 33, 39 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" <u>Ayotte v. Planned Parenthood of Northern New Eng.</u>, 546 U.S. 320, 329 (2006) (quoting <u>Regan v. Time, Inc.</u>, 468 U.S. 641, 652 (1984) (plurality opinion)).

<u>Id.</u>

## IV. ANALYSIS

In their Motion for Summary Judgment, Plaintiffs contend that Defendant's enforcement of Section 6105(c)(4) deprives them, and all other similarly-situated individuals committed under Section 302, of their right to bear arms without due process of law. (Doc. No. 62.) They argue that due process requires that Defendant provide a Section 302 committee with notice and a hearing before the PSP enters a mental health record of a person's commitment into the PICS and NICS

databases.  (Id. at 10.)  Furthermore, they claim that the post-deprivation remedies found in Section 6015(f)(1), Section 6111.1(g)(2), and Section 6111.1(e) do not adequately safeguard their rights. (Id. at 17.)  As a result, Plaintiffs contend that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

Defendant Evanchick, the Acting Pennsylvania State Police Commissioner, rejects the notion that the PSP's enforcement of Section 6105(c)(4) divests a Section 302 committee of his right to bear arms without due process, and therefore submits that he is entitled to judgment as a matter of law.  (Doc. No. 65.)  In his Motion for Summary Judgment, Defendant first argues that Plaintiffs' procedural due process claim fails because a Section 302 committee does not have a protected interest in obtaining a firearm.  (Id. at 8.)  But even if a Section 302 committee does have a protected interest in owning a gun, Defendant argues that due process does not require the PSP to provide additional pre-deprivation procedures before it enters a Section 302 committees' mental health record in the PICS and NICS databases.  (Id. at 13.)  Finally, Defendant submits that he is entitled to judgment as a matter of law because the three post-deprivation procedures available to Section 302 committees satisfy the requirements of due process.  (Id. at 18.)

The contentions the parties raise are purely legal questions.  They do not involve any disputed genuine issues of material fact.  Indeed, when a statute is challenged on its face, factual issues rarely are present.  Because the law at issue favors the position of Defendant, summary judgment in his favor is warranted.

The Due Process Clause of the Fourteenth Amendment prohibits deprivations of life, liberty, or property by a state without due process of law.  U.S. Const. amend. XIV.  Evaluating whether a law violates this prohibition requires a two-prong analysis.  First, the Court must ask whether there is a protected life, liberty, or property interest at stake.  Second, if a protected interest

exists, the Court must decide whether the procedures afforded amount to "due process of law." Robb v. City of Phila., 733 F.2d 286, 292 (3d Cir. 1984) (citing Bd. of Regents v. Roth, 408 U.S. 564, 569-72 (1972)). The Court will first address whether a protected interest is at stake.

A.   **An Individual Committed Under Section 302 of the MHPA has a Protected Liberty Interest in the Right to Bear Arms**

As an initial matter, Defendant argues that he is entitled to judgment as a matter of law because an individual committed under Section 302 does not have a protected interest in owning a firearm. (Doc. No. 65 at 8.) He contends that precedent from the Third Circuit Court of Appeals holds that the Second Amendment does not protect the right to bear arms by the mentally ill. (Id. at 10.) Plaintiffs vehemently disagree. While they acknowledge the existence of a longstanding prohibition on the possession of firearms by the mentally ill, they submit that a Section 302 committee does not fall into that prohibition, and for this reason has a protected liberty interest in the right to bear arms. (Doc. No. 62 at 10.) For the reasons stated infra, the Court is persuaded by Plaintiffs' argument.

The Supreme Court of the United States has repeatedly held that the "range of interests protected by procedural due process is not infinite." Ingraham v. Wright, 430 U.S. 651 (1977) (quoting Roth, 408 U.S. at 570)). To evaluate whether a plaintiff has a protected life, liberty, or property interest, a court must look to the nature of the alleged interest at stake. Roth, 408 U.S. at 570-71. Traditionally, a liberty interest "consisted of the power of locomotion, or changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint." Kerry v. Din, 135 S.Ct. 2128, 2133 (2015). But on several occasions, the Supreme Court has seen fit to expand this definition to include implied fundamental rights. Id. In those instances, the Court has required "'a careful description of the asserted fundamental liberty interest,' as well as a demonstration that the interest is 'objectively, deeply rooted in this Nation's

history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed.'" Id. (citing Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997)).  To determine whether an asserted interest constitutes a protected liberty interest, a court must ask whether the asserted interest is supported by "this Nation's history and practice." Id. (citing Glucksburg, 521 U.S. at 724, 727-728).

Here, the asserted liberty interest at stake is the right to bear arms.  The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In District of Columbia v. Heller, the Supreme Court invalidated a law that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." 554 U.S. 570, 628 (2008).  In so concluding, the Court held that there was "no doubt, on the basis of both text and history, that the Second Amendment conferred a right to keep and bear arms."  Id. at 595.  Further, the Court wrote that at the "core" of the Second Amendment is the right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  Id. at 643-35.

Two years later, in McDonald v. City of Chicago, the Supreme Court recognized that the Second Amendment right articulated in Heller applies to the states through the Fourteenth Amendment.  561 U.S. 742, 778 (2010).  There, the Court explicitly held that the right to bear arms is "deeply rooted in this Nation's history and tradition."  Id. at 768 (citing Glucksberg, 521 U.S. at 721).  In incorporating the right to the states, McDonald explained that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."  Id. at 778.

From Heller and McDonald, it is clear that the right to bear arms is a protected liberty interest. But in this case, the issue is not merely whether an individual has a protected liberty interest in the right to bear arms; instead, the court must decide whether an individual who has been temporarily committed for mental health reasons under Section 302 has a protected liberty interest in the right to bear arms.

Despite its recognition of the right to bear arms, the Supreme Court in Heller enumerated a non-exhaustive list of "presumptively lawful regulatory measures" that can restrict the right. See Heller, 554 U.S. at 626-27. Relevant here, the Supreme Court explained that nothing in Heller "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." Id. Although Heller articulated that the state has a public health and safety interest in prohibiting the possession of firearms by the mentally ill, see id., there is an absence of controlling precedent as to whether a Section 302 committee qualifies as mentally ill for the purposes of the Heller mental illness exception, such that he would not have a protected liberty interest in owning a gun.

Defendant argues that Heller announced a broad prohibition on the right to bear arms by the mentally ill and that Section 302 committees fall within this prohibition. In support of this argument, Defendant relies on the Third Circuit decision in United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010). But this reliance is unavailing. In Marzzarella, the defendant was indicted for possession of a handgun with the serial number scratched off in violation of 18 U.S.C. § 922(k). Id. He moved to dismiss the indictment, claiming that § 922(k) unconstitutionally infringed upon his Second Amendment right to bear arms. Id. The court denied the motion, and in dicta, stated that "the Second Amendment affords no protection for the possession of dangerous and unusual

weapons, possession by felons and the mentally ill, and the carrying of weapons in certain sensitive places." <u>Id.</u> at 92.

The decision in <u>Marzzarella</u> has little bearing here. First, the court in <u>Marzzarella</u> did not address a situation in which an individual challenged a firearm prohibition based on his status as mentally ill. The section of the court's decision that explores whether the Second Amendment protects the mentally ill is mere <u>dicta</u>. Second, that section does not expand upon <u>Heller</u>. As in <u>Heller</u>, the court in <u>Marzzarella</u> only stated that there exists a longstanding prohibition on the right to bear arms by the mentally ill. It does not delve into whether an individual temporarily committed under Section 302 should be considered mentally ill under <u>Heller</u>. Essentially, the court in <u>Marzzarella</u> does not explain how mentally ill an individual needs to be to fall into the longstanding prohibition on the right to bear arms by the mentally ill endorsed in <u>Heller</u>, such that he does not have a protected interest in owning a gun. Accordingly, the Court will turn to decisions of other Courts of Appeal that squarely address this issue.

In <u>Tyler v. Hillsdale County Sheriff's Department</u>, the Sixth Circuit Court of Appeals held that a temporary emergency commitment to a mental institution may not be enough to consider an individual mentally ill for the purposes of the <u>Heller</u> mental illness exception. 837 F.3d 678, 699 (6th Cir. 2016) (en banc). There, the plaintiff was barred from purchasing a weapon under 18 U.S.C. § 922(g)(4) after he was involuntarily committed to a mental institution pursuant to a Michigan statute much like Section 302. <u>Id.</u> at 699. In its decision, the Sixth Circuit cautioned against categorically relying on the language of <u>Heller</u> with respect to the longstanding prohibition on the possession of firearms by the mentally ill. <u>Id.</u> at 686-88. The court reasoned as follows:

> To rely solely on <u>Heller</u>'s presumption here would amount to a judicial endorsement of Congress's power to declare, "Once mentally ill, always so." This we will not do. <u>Heller</u>'s presumption of lawfulness should not be used to enshrine a permanent

29

> stigma on anyone who has ever been committed to a mental institution for whatever reason.

Id. at 688. Consequently, the Sixth Circuit held that "people who have been involuntarily committed are not categorically unprotected by the Second Amendment." Id. at 690.

Similarly, in United States v. Rehlander, the First Circuit Court of Appeals held that a temporary emergency commitment to a mental institution is not enough to permanently disqualify a person from owning a firearm under federal law. 666 F.3d 45, 50 (1st Cir. 2012). There, the court explained that although the right established in Heller is a qualified right, "the right to possess arms . . . is no longer something that can be withdrawn by government on a permanent and irrevocable basis without due process." United States v. Rehlander, 666 F.3d 45, 48 (1st Cir. 2012). Furthermore, the First Circuit has noted that "nothing [in Heller] suggests that the Court was there addressing a permanent ex parte deprivation" of the right to bear arms of an individual only temporarily committed to a mental health facility. Id. Implicit in this holding is the determination that an individual subjected to a temporary commitment does not fall into the longstanding prohibition on the right to own a gun by the mentally ill endorsed by Heller and therefore has a protected liberty interest in the right to bear arms.

Relying on the logic of Tyler and Rehlander, the Court is persuaded by Plaintiffs' argument. Although the Supreme Court in Heller articulated that prohibition on the right to own a gun by the mentally ill is presumptively lawful, a temporary emergency commitment to a mental institution is not sufficient to consider the individual "mentally ill" for the purposes of the Heller mental health exception. Thus, an individual committed under Section 302 still retains a protected liberty interest in the right to bear arms.

**B.    Defendant's Enforcement of Section 6105(c)(4) of PUFA Does Not Deprive Section 302 Committees of Their Right to Bear Arms Without Due Process**

Having found that a Section 302 committee has a protected liberty interest in owning a firearm, the Court will now proceed to the second step of the procedural due process analysis: whether the statutory procedures followed by Defendant satisfy due process of law.

When a protected interest is implicated, the Supreme Court has held that the Due Process Clause "grants the aggrieved party the opportunity to present his case and have its merits fairly judged." Logan v. Zimmerman, 455 U.S. 422, 434 (1982). However, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). The "timing and the nature of the required hearing will depend on appropriate accommodation of the competing interests involved." Logan, 455 U.S. at 434. To determine what procedural protection the Constitution requires in a particular situation, a court must weigh several factors:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

Plaintiffs first challenge Defendant's lack of pre-deprivation procedures. They argue that a Section 302 committee is entitled to notice and a hearing before the PSP records his mental health record in the PICS and NICS databases. Second, even if due process does not require additional pre-deprivation procedures in the instant case, Plaintiffs contend that the state statutory post-deprivation remedies do not safeguard their rights.

Defendant refutes both contentions. First, he submits that the factors set forth in Mathews weigh in his favor and that procedural due process does not require a pre-deprivation hearing in

this context.  Second, Defendant argues that Section 6105(f)(1), Section 6111.1(g)(2), and Section 6111.1(e)—the three post-deprivation remedies that allow a Section 302 committee to restore his right to bear arms—satisfy due process.  For the reasons stated <u>infra</u>, the Court is persuaded by Defendant's arguments.

       **1.**       **A Section 302 Committee is not Entitled to Additional Pre-Deprivation Procedures Before the Pennsylvania State Police Enter His Mental Health Record in the PICS and NICS Databases**

To determine whether Section 302 committees are entitled to any pre-deprivation procedures, the Court must weigh the <u>Mathews</u> factors.  As to the first <u>Mathews</u> factor, the private interest at stake, a Section 302 committee has a protected liberty interest in the right to bear arms.  Of course, that interest is weakened by fact that the committee was considered a clear and present danger to himself or others, if only for a short period of time.  Additionally, while this private interest surely exists, it must be noted that the right to own a gun is not one of life's basic necessities.  <u>See</u> <u>Potts v. City of Philadelphia</u>, 224 F. Supp. 2d 919, 943 (E.D. Pa. 2002) ("While Potts may have a strong personal interest in his gun permit, the permit does not constitute a basic necessity of life, such as income, or even employment, that would strongly militate in favor of a predeprivation hearing.").  <u>Compare</u> <u>with</u> <u>Goldberg v. Kelly</u>, 397 U.S. 254, 262 (1970) (termination of welfare benefits requires a pre-deprivation hearing because "welfare provides the means to obtain essential food, clothing, housing, and medical care").

The second <u>Mathews</u> factor directs the Court to examine the risk of erroneous deprivation of a Section 302 committee's protected liberty interest through the procedures currently used, and the probable value, if any, of additional procedural safeguards.  Turning to the first half of that inquiry, the lack of a pre-deprivation hearing does not create a high risk of erroneous deprivation of a Section 302 committee's right to bear arms.

First, there is a low risk that an individual committed under Section 302 was not a clear and present danger to himself or others at the time of his temporary commitment.  As stressed by Defendant, the procedures used to commit individuals under Section 302 are stringent.  For one, at least two individuals must observe conduct indicating that the individual is a clear and present danger to himself or others before he is temporarily committed.  As noted above, there are two methods of initiating a Section 302 commitment.  First, a physician or other responsible party can submit a written application to a county mental health administrator, stating the conduct that necessitates emergency medical health treatment.  Second, a physician, peace officer, or other party can take the individual to a treatment facility after observing conduct that demonstrates he is in need of treatment.  Regardless of how the individual comes to the treatment facility, a physician must examine him within two hours of his arrival and determine whether he is truly a clear and present danger to himself or others.  The individual is only committed if, within the last thirty days, (1) he has acted in a way that suggests he cannot care for himself and death, injury, or debilitation would ensure without treatment; (2) he has attempted suicide and there is a reasonable probability that suicide would occur without treatment; or (3) he has mutilated himself and there is a reasonable probability of future mutilation without treatment.  50 Pa. Stat. § 7301(b)(2)(i-iii).  Clearly, these procedures are designed to commit only those individuals who pose a clear and present danger to themselves or others, if only for a short period of time.

Turning to the latter half of the second Mathews factor, the Court is not persuaded that additional pre-deprivation safeguards—namely notice or a hearing—would be of value here.  In fact, a pre-deprivation hearing to determine whether a Section 302 committee is mentally ill enough to divest him of his right to bear arms is irrelevant to the statutory scheme at hand.  Several courts in this circuit have recently discussed this issue.

In <u>Bell v. United States</u>, 574 Fed. App'x. 59 (3d Cir. 2014), the Third Circuit affirmed the district court's holding that 18 U.S.C. 922(g)(1), which prohibits the possession of a firearm by a convicted felon, does not require a pre-deprivation hearing to determine the felon's "future dangerousness" to comport with the requirements of due process. On this issue, the Third Circuit adopted the logic of the district court, which reads as follows:

> "The plain language of [§ 922(g)(1)] makes clear Congress' decision to bar all convicted felons (not merely those with violent tendencies or who otherwise present an ongoing danger to society) from possessing firearms." <u>Black v. Snow</u>, 272 F. Supp. 2d 21, 34 (D.D.C. 2003), aff'd, <u>Black v. Ashcroft</u>, 110 Fed. App'x. 130 (D.C. Cir. 2004) (per curiam). As a result, "due process does not entitle [a felon] to a hearing to determine whether he is currently dangerous because the results of such a hearing would have no bearing on whether he is subject to the disability imposed by § 922(g)(1)." <u>Id.</u> at 35; <u>see also</u> <u>Conn. Dept. of Pub. Safety v. Doe</u>, 538 U.S. 1, 4 (2003) ("[D]ue process does not require the opportunity to prove a fact that is not material to the State's statutory scheme."). Accordingly, Bell's procedural due process claim fails.

<u>Bell v. United States</u>, No. 13-5533, 2013 WL 5763219, at *3 (E.D. Pa. Oct. 24, 2013). In <u>Bell</u>, the plaintiff also brought a procedural due process challenge to 18 Pa. Cons. Stat. § 6105(b), the Pennsylvania law that prohibits convicted felons from owning firearms. <u>Id.</u> For the same reasons given with respect to the federal statute, the court rejected the plaintiff's Section 6105 challenge. <u>Id.</u>

In <u>Keyes v. Lynch</u>, 195 F. Supp. 3d 702, 723 (M.D. Pa. 2016), the court extended the reasoning of <u>Bell</u> to § 922(g)(4), the federal statute prohibiting an individual subject to an involuntary commitment from owning a firearm. In <u>Keyes</u>, the plaintiff brought a procedural due process challenge to § 922(g)(4), arguing that the federal government owed him notice and a pre-deprivation hearing before depriving him of his right to own a gun because of his involuntary commitment. <u>Id.</u> The court applied <u>Bell</u> and rejected his due process claim, finding that "the statute subsection is clear that anyone who has been committed for mental health is subject to it;

thus a hearing of whether the plaintiff is still dangerous is not in fact relevant." Id. In 2017, yet

another district court agreed. In Jefferies v. Sessions, the district court explained itself as follows:

> Congress enacted § 922(g)(4) to apply to all persons involuntarily committed. Mr.
> Jefferies does not challenge the propriety or accuracy of his involuntary
> commitment. Rather he asks for an exemption in spite of it. Mr. Jefferies does not
> have a Fifth Amendment right to procedural due process before the United States
> applies § 922(g)(4) to him because of his involuntary commitment.

278 F. Supp. 3d 831, 846 (E.D. Pa. 2017).[15]

Because the same is true with respect to Section 6105(c)(4), the Pennsylvania statute

prohibiting an individual committed under Section 302 from owning a firearm, the same result

follows. Plaintiffs argue that "[a] pre-deprivation hearing is necessary to determine whether any

individual subject to Section 302 commitment suffers from a mental health condition sufficient to

require depriving them of a protected liberty interest." (Doc. No. 62 at 7.) But the Pennsylvania

legislature enacted Section 6105(c)(4) to apply to all persons temporarily committed under Section

302. Nothing in the statute suggests that only Section 302 committees on the more dangerous or

severe end of the mental health spectrum are subject to the Section 6105(c)(4) prohibition. Thus,

a hearing to determine where a Section 302 committee falls on that spectrum is not relevant to the

statutory scheme and has no value.

Despite the line of cases noted supra, Plaintiffs still contend that a Section 302 committee

is entitled to pre-deprivation procedures before he is divested of his right to bear arms. To support

this contention, Plaintiffs cite to the procedures that protect an individual before his Section 302

commitment is extended under Sections 303 and 304, namely that he is entitled to an informal

hearing, the right to counsel, the right to present evidence, and the right to question witnesses.

---

[15] Both Jefferies and Keyes were decided after this Court issued its Opinion denying
Defendant's Motion to Dismiss. (Doc. Nos. 32, 33.) Consequently, the Court did not
consider this reasoning in its decision.

(Doc. No. 62 at 18-19.)  Citing to the apparent feasibility of these procedures, Plaintiffs argue that it is feasible to provide a Section 302 committee with additional procedures after he has already been committed, but before he is divested of his right to bear arms.  (Id.)  But this comparison lacks merit.  The procedural safeguards cited by Plaintiffs protect an individual before he is subjected to further involuntary commitment.  The procedures are wholly irrelevant to whether a Section 303 or 304 committee can later own a gun.  Thus, the mere fact that an individual has the right to a hearing before he is committed under Section 303 or Section 304 is immaterial to whether a Section 302 committee should have a hearing before he loses his right to bear arms.

Finally, the Court will consider the third Mathews factor: the nature of the government interest.  The Commonwealth of Pennsylvania has a prevailing interest in public safety and ensuring that potentially dangerous individuals are not permitted to own a deadly weapon.  And as noted above, nothing in Heller prevents the government from protecting this interest by prohibiting the mentally ill from owning a firearm.  See Heller, 554 U.S. at 626-27.

In drafting Section 6105(c)(4), the Pennsylvania legislature explicitly stated that an individual "adjudicated as an incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under section 302, 303, or 304" of the MHPA "shall not possess, use, control, sell, transfer or manufacture . . . a firearm . . . ." 18 Pa. C.S.A. §§ 6105(a), (c)(4).  This prohibition exists because at the time of his commitment a Section 302 committee is "severely mentally disabled and in need of immediate treatment" and has shown that "his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself." 50 Pa. Stat. § 7301(a).  The dangers inherent in the possession of a deadly firearm by someone with such a lessened capacity for "self-control, judgment, and

discretion" are manifest. Such an individual poses a grave threat to public safety. Given this danger and Pennsylvania's prevailing interest in public safety, the third <u>Mathews</u> factor weighs against the necessity of a pre-deprivation hearing.

Nevertheless, Plaintiffs contend that the government's interest in divesting a Section 302 committee of his right to bear arms is not urgent, and that there is sufficient time to hold a pre-deprivation hearing. (Doc. No. 62 at 19-20.) Typically, a state is required to provide pre-deprivation remedies to satisfy due process. <u>See</u> <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532, 542 (1985). But the Supreme Court has held that "either the necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." <u>Parratt v. Taylor</u>, 451 U.S. 527, 539 (1981).

Plaintiffs argue that this case does not fall into either exception and point to the fact that under PUFA, Section 302 commitments are not reported for seven days and Section 302 committees have 60 days following their commitments to sell or transfer firearms already in their possession. (Doc. No. 62 at 18.) They contend that these procedures demonstrate that there is no "necessity of quick action" that requires the PSP to enter a mental health record into the PICS and NICS databases without first holding a hearing. (<u>Id.</u>) On this point, the Court agrees with Plaintiffs. There appears to be sufficient time between a Section 302 commitment and the moment at which the PSP creates a mental health record to hold some sort of hearing.

But Plaintiffs' argument ignores the fact that a pre-deprivation hearing is impractical. As noted above, Section 6105(c)(4) is clear that anyone who has been committed under Section 302 cannot own or possess a firearm. In drafting Section 6015(c)(4), the Pennsylvania legislature

explicitly prohibited individuals temporarily committed under Section 302 from owning a gun, signaling that the prohibition exists regardless of the temporary nature of the commitment, whether the commitment was isolated, or whether the individual continues to pose an ongoing threat to public safety.  Thus, while there is sufficient time to hold a pre-deprivation hearing, such a hearing would be impractical because it would have no bearing on whether a Section 302 is subject to Section 6105(c)(4).

Weighing a Section 302 committee's private interest in owning a gun against the government's prevailing interest in public safety, and given the negligible risk of erroneous deprivation without a pre-deprivation hearing, the Court is not convinced that the Due Process Clause of the Fourteenth Amendment entitles a Section 302 committee to a pre-deprivation hearing before he is divested of his right to own a gun.  Even if a pre-deprivation hearing were practical or relevant, the cost of allowing a potentially unstable individual to retain a dangerous weapon while he waits for a pre-deprivation hearing far outweighs any potential benefits of a pre-deprivation hearing, particularly in light of the post-deprivation remedies discussed infra.  Thus, the Court is persuaded by Defendant's argument that Plaintiffs do not have a right to a pre-deprivation hearing before the PSP enters their mental health record into the PICS and NICS databases.

### 2. PUFA's Post-Deprivation Remedies Adequately Safeguard a Section 302 Committee's Due Process Rights

As noted above, a state is not required to provide pre-deprivation process where meaningful post-deprivation remedies are available to assess the propriety of the state's action.  Parratt, 451 U.S. at 539.  Accordingly, a state's deprivation of liberty or property does not violate the Due Process Clause where the state provides adequate post-deprivation remedies.  Id. at 540-41.  Here, PUFA sets forth three post-deprivation remedies that a Section 302 committee can use to attempt

to restore his right to bear arms.  To evaluate whether these remedies comport with due process, the Court turns to the test set forth in <u>Mathews v. Eldridge</u>.

Again, the private interest at stake is a Section 302 committee's right to bear arms.  As discussed above, the government has a prevailing interest in keeping fatal weapons out of the hands of potentially dangerous individuals for the sake of public safety.  In this regard, the procedures at issue at this point in the Court's inquiry are the three post-deprivation remedies set forth in PUFA: (1) Section 6105(f)(1); (2) Section 6111.1(g)(2); and (3) Section 6111.1(e)(1).

Plaintiffs argue that the second <u>Mathews</u> factor—risk of erroneous deprivation of their private interest through the procedures used and the probable value, if any, of additional procedural safeguards—weighs in their favor.  (Doc. No. 62 at 24).  Specifically, they take issue with the fact that only one of the three state statutory remedies allow for the restoration of the right to bear arms under both state and federal law.  (<u>Id.</u>)  As a result, Plaintiffs contend that the post-deprivation procedures currently available to them are "inadequate to overcome the profound constitutional harm to Plaintiffs and any other similarly situated individual," such that they are "automatically and permanently divested of their Second Amendment right."  (<u>Id.</u>)

Defendant disagrees.  He submits that the three procedures provided by the Commonwealth of Pennsylvania satisfy the requirements of due process.  (Doc. No. 65 at 18.)  In support of his argument, Defendant asserts that all three post-deprivation remedies allow a Section 302 committee to restore his state firearm rights, and one post-deprivation remedy allows a Section 302 committee to completely expunge his record, restoring both state and federal firearm rights.  (<u>Id.</u> at 21-23.)  Defendant argues, and the Court agrees, that Due Process requires nothing more.  (<u>Id.</u> at 27.)  For clarity, the Court will again summarize the three statutory remedies that a Section 302 committee can use to restore his right to own and possess a firearm.

First, a Section 302 committee that submits that he is no longer committable or mentally ill may petition the court of common pleas to restore his firearm rights pursuant to Section 6105(f)(1). 18 Pa. Cons. Stat. Ann. § 6105(f)(1). The committee may seek restoration of his rights at any time after he is legally divested of his right to own or purchase a gun. Section 6105(f)(1) permits restoration if "the court determines that the applicant may possess a firearm without risk to the applicant or any other person." Id. This process allows for a full evidentiary hearing in the court of common pleas at which both parties have the right to present evidence and the right to cross-examine witnesses. (Doc. No. 66 ¶ 49.) A successful 6105(f)(1) petition restores a committee's state firearm rights and the PSP will remove his mental health record from the state PICS database. (Id. ¶ 50.) But Section 6105(f) cannot restore federal firearm rights. (Id.) Thus, if an individual is only successful in restoring his state firearms rights, and has not petitioned to have his federal rights restored, the PICS database will note that the individual is still prohibited from possessing a gun under federal law. (Id.)

Second, a Section 302 committee can seek expungement of his Section 302 commitment by petitioning a court of common pleas under Section 6111.1(g). Using this section, a committee "may petition the court to review the sufficiency of the evidence upon which the commitment was based." 18 Pa. Cons. Stat. Ann. § 6111.1(g)(2). As noted earlier, the Pennsylvania Supreme Court recently explained what a sufficiency of the evidence review entails:

> [A] challenge to the sufficiency of the evidence to support a 302 commitment presents a pure question of law, and the court's sole concern is whether, based on the findings recorded by the physician and the information he or she relied upon in arriving at those findings, the precise, legislatively-defined prerequisites for a 302 commitment have been satisfied and are supported by a preponderance of the evidence. We emphasize that the trial court's review is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings, and requires deference to the physician, as the original factfinder, as the physician examined and evaluated the individual in the first instance, was able

to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary.

In re Vencil, 152 A.3d 235, 242 (Pa. 2016). "If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged." § 6111.1(g)(2). If an individual successfully expunges his Section 302 commitment under this section, both his state and federal rights are restored. (Doc. No. 63 ¶ 61.)

Finally, Section 6111.1(e) allows a Section 302 committee to challenge the accuracy of his mental health record after he has been denied the right to purchase a firearm. 18 Pa. Cons. Ann. § 6111.1(e). The committee may challenge the record by submitting an administrative challenge to the PSP. § 6111.1(e)(1). If the PSP finds rejects the challenge, the committee can appeal the decision to the Pennsylvania Office of Attorney General, at which point an Administrative Law Judge will hold a hearing de novo. § 6111.1(e)(3). The Administrative Law Judge's decision may be appealed to the Pennsylvania Commonwealth Court. § 6111.1(e)(4). The Commonwealth Court's scope of review is "limited to a determination of whether necessary findings are supported by substantial evidence, an error of law was committed or whether constitutional rights were violated." Gorry v. Pennsylvania State Police, 144 A. 3d 214, 216-17 (Pa. Cmwlth. 2016) (quoting Pennsylvania State Police v. Heggenstaller, 784 A.2d 853, 856 n.6 (Pa. Cmwlth. 2001)).

Having reviewed Section 6105(f), Section 6111.1(g)(2), and Section 6111.1(e), the Court is persuaded by Defendant's argument that these three post-deprivation procedures satisfy due process. Plaintiff contends that Defendant's enforcement of Section 6105(c)(4) "permanently" divests a Section 302 committee of his right to bear arms. But this is incorrect. Indeed, the three procedures set forth above provide a Section 302 committee with three different avenues to restore his rights. First, under Section 6105(f), he may argue that he is no longer a danger to himself or

public safety. Second, under Section 6111.1(g)(2), he may submit that he never should have been committed in the first place. And finally, under Section 6111.1(e), he may claim that the PSP's records are inaccurate, and the firearm prohibition does not apply to him. These procedures are not insignificant. As stated earlier, according to PSP statistics, forty-one (41) Section 302 committees pursued restoration through one of the three available post-deprivation procedures between January 1, 2017 and December 31, 2017. Of that number, seventeen (17) individuals were successful.[16] (Doc. No. 65 at 26.) Thus, through these three procedures, there is nothing "permanent" about Section 6105(c)(4).

Plaintiffs argue that these post-deprivation procedures do not satisfy due process because a successful Section 6105(f)(1) petition only restores state rights, and not federal rights. (Doc. No. 62 at 23.) Further, although Plaintiffs concede that the federal right to bear arms can be restored through Section 6111.1(g)(2), they contend that Section 6111.1(g)(2) is inadequate because the sufficiency of the evidence standard of review at "expungement hearings amount[s] to little more than review for plain error of an incomplete and inadequate record . . . ." (Id.) The Court disagrees.

The "sufficiency of the evidence" standard is a well-established standard of review that courts employ in several contexts, including for example review of petitions for habeas corpus, Eley v. Erickson, 712 F.3d 837 (3d Cir. 2013), and motions for acquittal under Federal Rule of Criminal Procedure 29, United States v. Young, 334 Fed. App'x. 477, 480 (3d Cir. 2009). The

---

[16] In their Response, Plaintiffs take issue with the fact that Defendant produced these statistics on the last day of fact discovery, giving them no time to conduct additional discovery on the numbers. (Doc. No. 69 at 13.) In support of their challenge, Plaintiffs cite to Elena Myers Court v. Loews Philadelphia Hotel, Inc., No. 16-4848, 2017 WL 6406458, at *5 n.2 (E.D. Pa. Dec. 15, 2017). There, the court held that an affidavit was inadmissible because it was produced after the close of discovery. Id. Here, however, the statistics were produced on the final day of fact discovery. Although the statistics were supplied at the latter end of the discovery period, they were not untimely. As a result, they are admissible.

mere fact that this standard gives deference to the original fact-finder does not mean that it amounts to "little more than review for plain error of an incomplete and inadequate record." (See Doc. No. 62 at 23.) Instead, there are several justified reasons for employing this deferential standard. In the context of a Section 302 commitment, the original fact-finder, who is the physician who first examines and evaluates the individual, is in a unique position to observe his demeanor, actions, and mental state at the time of the proposed involuntary commitment. This is not a fact-finding exercise that is easily replicated months if not years later at an expungement hearing. Further, the treating physician has particularized training, knowledge, and experience as to whether a Section 302 commitment is medically necessary. As such, a certain amount of deference is appropriate, especially considering the strong and prevailing nature of the government's interest in keeping potentially fatal weapons out of the hands of potentially dangerous individuals.

Compare the procedures available here to the lack of procedures available in United States v. Rehlander. In Rehlander, two individuals were involuntarily committed to psychiatric hospitals for emergency, temporary treatment, and each were later convicted for possessing firearms in violation of 18 U.S.C. § 922(g)(4). Rehlander, 666 F.3d at 46. Both individuals moved to dismiss their indictments on constitutional grounds, arguing that, as applied to them, Section 922(g)(4) violated their Second Amendment right to bear arms and their Fifth Amendment right to due process. Id. at 47. The district court denied the motion, but the First Circuit Court of Appeals reversed, noting the lack of post-deprivation means for temporarily committed individuals to recover the right to bear arms. Id. at 49. The court reasoned as follows:

> This would be a different case if section 922 addressed ex parte hospitalizations and provided for a temporary suspension of the right to bear arms pending further proceedings. It could also be different if section 922 permitted one temporarily hospitalized on an emergency basis to recover, on reasonable terms, a suspended right to possess arms on a showing that he now no longer posed a risk of danger.

> In all events, right now there is no recovery procedure in Maine that would avoid the ban of section 922.

Id. (emphasis in original). In contrast to Rehlander, Pennsylvania law provides three statutory remedies that allow a Section 302 committee to restore his right to own a gun. All three procedures allow for the restoration of a state right to bear arms, and Section 6111.1(g)(2) allows for the restoration of both state and federal rights.

Weighing Section 302 committees' lessened private interest against the government's strong interest in public safety, and considering the negligible risk of erroneous of deprivation through Section 6105(f), Section 6111.1(g)(2), and Section 6111.1(e), the Court is convinced that these three post-deprivation remedies provide Section 302 committees with adequate due process. Consequently, Defendant's enforcement of Section 6105(c)(4) does not deprive a Section 302 committee of his right to bear arms without due process. As a result, Defendant is entitled to judgment as a matter of law.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Doc. No. 61) will be denied, and Defendant's Motion for Summary Judgment (Doc. No. 65) will be granted. Judgment will be entered in favor of Defendant. An appropriate Order follows.